under it before he can maintain an action, does not apply where he does not seek a rescission, but denies making such contract, and claims that his signature was obtained by deceit as to the contents of the paper."

Judge Cullen, in writing the opinion in that case, says:

"Therefore in this case if the plaintiff had admitted the compromise or his execution of the release, but claimed that he had been induced to make the compromise by fraud, duress or imposition, he would have been bound to return the consideration received before he could maintain his action. But that was not the issue in the case. Plaintiff did not seek to avoid the contract of compromise. He denied making any such contract."

This case was affirmed by the Court of Appeals in 139 N. Y. 643, 35 N. E. 206, upon the opinion of Justice Cullen. Among all the cases cited by my learned associate in the prevailing opinion there is not one which holds a contrary doctrine. In the case of Reynolds v. Westchester Fire Insurance Co., 8 App. Div. 193, 40 N. Y. Supp. 336, the complaint offered to restore what had been received under the contract. In the other cases cited either the question was not raised and discussed by the opinion, or a distinction was found as appears in the Cleary Case above cited.

In the light of these rules of law, the plaintiff's complaint seems to me clearly defective. It first states the cause of action for insurance. It then states that the plaintiff was induced to compromise the same by the fraud and duress of one of its officers. There is no question that the release was signed and the compromise made. The plaintiff only seeks relief by rescinding the compromise. This she does not claim to have done, but asks in her complaint specifically "that the so-called alleged release and settlement made between said defendant and said plaintiff as aforesaid be rescinded, vacated, and set aside," and this without any offer whatever to return the $500; but she asks that said $500 may be credited upon the amount subsequently found due to her, and she have judgment for the remaining $500. If upon the conceded facts there was at least $500 due to her, this would be a sufficient complaint; but no facts are here conceded which would entitle her to the $500 paid if the compromise be set aside. This is made by the plaintiff a cause of action in equity, and within the authorities above cited the complaint would seem to be defective in not alleging an offer to return the $500 received upon the compromise.

---

KINSER CONST. CO. v. STATE.

(Supreme Court, Appellate Division, Third Department. May 3, 1911.)

CANALS (§ 15*)—CONTRACTS—MODIFICATION.

A contract for the construction of a section of the State Barge Canal, including a lock within the section, reserved to the state the right to make deductions from the work, and provided that the contractor would make no claim for any loss of profits resulting therefrom, and that he had satisfied himself by his own investigations of the conditions affecting the work, and that he would make no claim against the state because of estimates and representations by any agent of the state. During the progress of the work, conditions were discovered that rendered it im-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

possible to construct a lock at the place named in the plans, and the state eliminated the construction thereof within the section included in the contract. *Held*, that the state exercised a right reserved to it by the contract, and the contractor could not recover from it estimated profits earned if completing the work under the contract.

[Ed. Note.—For other cases, see Canals, Dec. Dig. § 15.*]

Appeal from Court of Claims.

Action by the Kinser Construction Company against the State of New York. From a judgment of the Court of Claims granting less than asked, the claimant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, SEWELL, HOUGHTON, and BETTS, JJ.

Kellogg & Rose, for appellant.

Thomas Carmody, Atty. Gen., for respondent.

BETTS, J. November 23, 1906, the above-named construction company and the defendant made a written contract known as contract No. 7 for the improvement of the Champlain Canal between Dunham's Basin Road and the Hudson river at Ft. Edward in accordance with plans and specifications which formed a part of the contract. The Kinser Construction Company agreed to build 3.76 miles of the Champlain Canal and was to be paid therefor by the state as the work progressed in installments according to the amount of work done and materials furnished, and a certain percentage was to be retained until the completion of the entire contract.

The construction company began the work under its contract and completed quite a portion thereof, and payments were made thereunder by the state. Included in the work agreed to be done was the erection of a lock No. 7, concerning the erection or nonerection of which there was trouble later. Various alteration orders were made under the provisions of the contract, and the work was done or partly done under such orders by the construction company; the parties thus giving practical construction to that part of the contract. In November occurred a cave-in or slide of quite a large portion of the bank of the canal at lock No. 7, whereupon the slope at the location of lock No. 7 was changed from one on one as it was to one on three. On December 15, 1908, while the construction company was excavating for said lock No. 7, another and an immense slide occurred, which let down into the excavation material approximating from 500 to 600 feet long and from 90 to 100 feet wide, which ran very nearly to the middle of the old Champlain Canal, which was eastward of the proposed new canal. It was then found that the material at this lock No. 7 was a slippery, greasy clay and extended a depth of 40 feet or more below the excavation, whereupon the state on December 18, 1908, halted the construction south of station 1,217 by the following letter:

"Albany, December 18, 1910.

"Kinser Construction Company, Fort Edward, N. Y.—Gentlemen: Owing to the fact that we have under consideration the matter of changing location of lock 7, which may be thrown either to the north or south, which might affect the plans of all work south of station 1,217, I deem it for the

best interest of the state and hereby direct you to discontinue all work south of station 1,217 until such time as we have new plans perfected.
"Yours very truly,                               [Signed]   W. R. Hill,
                                                    "Special Deputy State Engineer."

The stations included in this contract ran from a little past station 1,041 to station 1,245, and the discontinuance of the work directed was from station 1,217 south, which would take in about from station 1,217 to station 1,245, a distance a little over one-half a mile. No interference was made by the state with the prosecution of the work north of station 1,217, some of which was uncompleted. The construction company stopped work at about the date of this letter, or on or about December 24, 1908, as was claimed in a subsequent letter by the construction company. On May 21, 1909, the construction company wrote remonstrating against the long delay and announcing that they were suffering damages by not being permitted to proceed. On or about June 12, 1909, the state officials issued alteration or change orders, know as change orders No. 7 and No. 6, making substantial changes in the contract originally made and discontinuing or eliminating the construction of lock No. 7 originally contracted for, as that was to be constructed entirely outside of the part of the canal covered by the construction company's contract. This was followed by the letter of June 24, 1909, which is as follows:

"Albany, N. Y., June 24, 1909.
"Kinser Construction Co., Fort Edward, N. Y.—Gentlemen: On December 24, 1908, you were ordered by former Special Deputy State Engineer Wm. R. Hill to discontinue all work on your contract No. 27, south of sta. 1,217, until such time as new plans might be perfected. The order of December 24 is hereby rescinded.
"Very truly yours,                               [Signed]   Wm. B. Landreth,
                                                    "Special Deputy State Engineer."

This letter rescinded the previous stop order. Upon receipt of this letter, and on or about July 1, 1909, the construction company notified the superintendent of public works by letter that it declined to comply with the said order and would cease all work under said contract and hold the state of New York liable for all damages occasioned by the action of the state and for breaches of said contract. The letter is as follows:

"July 1st, 1909.
"Hon. Frederick C. Stevens, Superintendent of Public Works, Albany, N. Y.—Dear Sir: We are in receipt of a letter from Mr. William B. Landreth, Special Deputy State Engineer, dated June 24th, 1909, making certain fundamental changes in the plan covering the work embraced in our contract No. 27, and also eliminating therefrom and taking from us large portions thereof.
In answer thereto we have forwarded to him a letter of which the inclosed is a copy.
We hereby notify you that we decline to comply with said order, and as we have been verbally informed by those in authority that the same will be insisted upon, we hereby notify you that we elect to treat the said order and insistence thereon as in violation of the terms of said contract and as a breach thereof. We shall accordingly cease all work under said contract, and shall hold the state of New York and its officers liable for all damages occasioned by the said action on the part of said state, and the breaches of

said contract above referred to, as well as all other breaches in connection therewith. We are

"Yours very respectfully,    The Kinser Construction Company,
"By T. W. Kinser, President."

Thereafter this claim was filed and tried in the Court of Claims; the construction company claiming damages of $370,525.41 for various items alleged in its claim. A trial was had and resulted in a judgment against the state for $70,679.25, with interest on a portion thereof, amounting all together to $77,425.46, from which determination this construction company appeals on the ground that it is insufficient.

It appears from an examination of the evidence here that, after the second and large cave-in, where this lock No. 7 was to be constructed, the state made an examination of the soil there and concluded that it was neither prudent nor safe to attempt to erect a lock in that location. The soil was a slippery, greasy clay there from 40 to 70 feet down in the ground. It was decided by the state that it was not possible to carry the weight of the great lock with the added water which would be therein when the lock was in use upon wooden piles, and that the expense of concrete piles was practically prohibitory and in any event unnecessary. Concrete piles were not specified, and if adopted would make a practically new contract which claimant would have secured without being the lowest bidder therefor. In other words, the state officials decided that the lock planned for could not be built in the section covered by the contract of the construction company; hence it was decided to move the lock farther south and outside of the contract territory of the construction company. Eliminating this lock, of course, made substantial changes in what should be done in place of the lock in this work so contracted to be done by the construction company. In other words, the state directed the construction company to do all which it considered proper to be done on ascertaining these heretofore unknown conditions, in the soil within the territory covered by the contract of the construction company. It was less expensive work than had been provided for in the original contract, which included the lock No. 7; hence the construction company found that it had a contract which would bring it in much less money and take much less work than it contemplated when it entered in the original agreement. This contract was a small portion of the work that was being done in the construction and alteration of the Barge Canal System of the state of New York. The construction company knew of the magnitude of this work, of course. It was a matter of common knowledge, and the claimant had another contract for construction work of about 10 miles long near Montezuma with the state; that being another portion of the proposed Barge Canal.

The state claims that the construction of lock No. 7 as planned at the location in question was impossible, and that it was also impossible to secure a suitable site within the limits of the construction company's contract for the lock as planned, and the Court of Claims has so found. The state justifies its taking away the construction of this lock from the construction company under several provisions of the contract, the more important of which is section 7, which is as follows:

"Sec. 7. It is mutually agreed that the state reserves the right until the final completion and acceptance of the work, to make such additions to or deductions from such work or changes in the plans and specifications covering the work, as may be necessary, and the contract shall not be invalidated thereby, and no claim shall be made by the contractor for any loss of profits because of any such change or by reason of any variation between the quantities of the approximate estimate and the quantities of the work as done."

This section provided, in substance, that the state might make such additions to or deductions from the work provided for in the contract or changes in the plans and specifications as might be necessary, and the contract should not thereby be invalidated, nor should the contractor have any claim for loss of profits. In this connection section 11 of the contract is important. It is as follows:

"Sec. 11. The contractor agrees that he has satisfied himself by his own investigation and research regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities or other information prepared by the state engineer, and that he shall make no claim against the state because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the state, may prove to be in any respect erroneous."

It appears that conditions were discovered in this ground underneath the bottom of the proposed new lock No. 7 which were unknown to either party at the time of the making of the contract. The construction company's witnesses testified that it would be impracticable, if not impossible to construct this lock at the place named under the plans contained in the contract; therefore a condition arose which was unforeseen by either party at the time the contract was entered into by which it was necessary for the state to change the location of lock No. 7 and take it out of the territory covered by the construction company's contract. I think this was a contingency that was provided for in section 7, and that by that section and section 11 no recovery can be had by the construction company here any farther than has already been had.

I think the state clearly had the right under the contract to discontinue part of the work as was done here and to put in new work as a substitute, as it was practically impossible to build lock No. 7 on or in the soil shown to exist at the place originally selected therefor.

The construction company would probably have earned some of its estimated profits if it had continued the work as it was directed to do, instead of stopping and throwing up the contract. It is apparent that it had taken out very largely of the dirt excavation and left unexcavated a considerable portion of the rock north of station 1,217. It received for the excavations the same price per yard, and no sufficient reason is shown why it could not and should not have gone on with the work as contracted for when the difference between the amount that it would have received and that it expected to receive originally would have been very materially lessened.

It would be very inequitable for the state to be compelled to pay the construction company for its estimated loss of profits, as the lock still remains to be built and other work to be done, and the party do-

ing it will, of course, bid a large enough amount for his work to cover his profits which the state will have to pay, so that, if the state should be compelled by the courts to pay the construction company for profits on this contract, it would be paying double profits, which would be unjust to it and unjust to the taxpayers who ultimately have to meet these expenses. By paying twice for estimated profits on different sections, the state might easily exceed the total allowed and appropriated for the entire new Barge Canal. The loss of profits is the principal matter litigated here; the claimant putting the amount at over $210,000—although the construction company alleges that it should have been allowed larger amounts for some other of its claims, but I think the Court of Claims was sufficiently liberal with it.

In the matter of the surety bond no claim was established against the state for the amount paid by the construction company therefor or any portion thereof.

I think the construction company is not entitled to profits estimated on work undone, much of which it has estimated, on work that it refused to do, and on which the state will have to pay profits to other contractors.

It follows that the judgment of the Court of Claims should be affirmed, with costs to the state.

Judgment unanimously affirmed, with costs. All concur; HOUGHTON, J., in result.