BORIS N. SOKOLOFF, Plaintiff, *v.* THE NATIONAL CITY BANK OF NEW YORK, Defendant.

Supreme Court, New York Special Term, December, 1922 (Received February, 1923).

Banking — deposit in New York bank to open credit in Russia — subsequent revolution in Russia — inability of bank to carry out contract by reason of governmental act — doctrine of frustration — when defenses setting forth facts proper.

The Soviet government of Russia not having been recognized by our government may not have ascribed to it any of the attributes of sovereignty, hence it has not legal capacity to sue in the courts of this state.

In contemplation of American courts all acts of the Soviet government in Russia, without the consent of the parties concerned, are ineffective to create, transfer or nullify legal obligations.

Unless a contractor by stipulation in an absolute executory contract has protected himself against inability to execute it, caused by unforeseen accident or misfortune, he must perform or pay damages for failure to perform.

Where, however, it appears by the contract that the parties knew and contemplated that its fulfillment would be dependent upon the continuance or existence at the time for performance of certain things or conditions essential to its execution, then if before default they cease to exist and thereby performance becomes impossible without fault on the part of the contractor, he is by force of the implied condition to which his contract is subject relieved from liability for the consequence of his failure to perform.

Allegations in a pleading tending to show that a government is sovereign in character are not conclusive on demurrer but the court is bound to take judicial notice of the fact as it exists in reality and, as an aid to enable it to correctly determine the fact, the court may have recourse to such sources of information as it deems most trustworthy.

In March, 1917, a revolution in Russia resulted in the establishment of the Kerensky government. In June, 1917, plaintiff, who at all the times embraced by the transactions hereinafter mentioned was a citizen or subject of Russia, paid to the defendant bank at the city of New York $30,225, upon its agreement to open an account with him in its Petrograd branch in Russia which was opened in January, 1917, and to repay him in rubles at a certain rate in such sums and at such times as he might by written order demand. On or about November 2, 1917, in which month there came a second revolution by means of which the Russian Federated Soviet Republic was established, the plaintiff in writing directed the branch bank to transfer 120,000 rubles to another institution in the city of Kharkoff, Russia, to his credit. This order not having been complied with, plaintiff on or about February 1, 1918, drew his check on the branch bank to the order of another for 122,000 rubles. On or about February 10, 1918, the agent attempted to present the check duly indorsed for payment but was unable to do so because the branch bank had previously been discontinued and closed and the defendant had ceased doing business in Russia without leaving any representative to whom the check could be presented for payment. One of the rules prescribed by the Imperial Russian government upon authorizing defendant to do business in Russia was to the effect that the settlement of litigation between the defendant and government officials or other persons arising out of defendant's operations must be settled

in Russian courts according to Russian law and that the discontinuance of its business in Russia should be subject to that law and the decisions of the Russian government then and thereafter in force. In an action to recover the unpaid balance on deposit with defendant the answer besides a general denial pleaded as an affirmative and also as a partial defense that upon the establishment of the Soviet government it became, has since been and is now the government of that portion of the territory embraced in the former Russian empire in which defendant's Petrograd branch operated and has exercised and now exercises the sole governmental authority therein; that the deposit account, if any, of the plaintiff, was " seized and confiscated by the government and thereupon became its property; and all the right, title and interest of the plaintiff therein and thereto, as against the defendant, became divested." It was further alleged that at the time the agreement was made with defendant " the plaintiff was fully aware of the unsettled condition of Russia, and the probability of political and governmental changes; and that it was intended by the parties that the said alleged agreement should be performed in Russia and that the performance thereof should be governed by the laws of Russia, and by any orders or decrees of any government which might exercise authority in Russia or that part thereof where the defendant's Russian branch might be situated." Finally it was alleged that the " means of performance contemplated by the parties thereto of the alleged contract between the plaintiff and the defendant relating to the deposit account of the plaintiff in the defendant's Petrograd branch were destroyed by the said acts of the Soviet government and by superior force and through no fault, negligence or act of the defendant or its Petrograd branch." Upon denying a motion under rule 109 of the Rules of Civil Practice to strike out said defenses as insufficient in law, *held,* that while the courts may not recognize the Soviet government it did not follow that a state of anarchy in Russia must be assumed.

As the defense under attack alleges political and governmental facts tending to show the impossibility of the performance of the contract, there was no valid objection to permitting the defendant to prove upon the trial, as pertinent, the actual conditions prevailing in Russia.

The application of the doctrine of frustration, which is not limited to any class of cases or state of facts, depends upon whether a person or thing or condition or state of things upon the existence or continuance of which performance of a contract fundamentally depends has ceased to exist, thus rendering performance impossible, and the affirmative defense brings the defendant within the rule.

The action being to recover damages for failure to perform in Russia according to the agreement and not for a rescission thereof *ab initio,* it cannot be said that the defendant should return the consideration received by it in New York.

Both the plaintiff and the defendant found themselves equally helpless in the momentous governmental upheaval which had occurred, and while the rule, that foreign law will not excuse performance of a contract, has its limitations, in any event it has no application to the case at bar.

MOTION to strike a defense from the answer.

*Morris Hillquit,* for plaintiff.

*Shearman & Sterling (Carl A. Mead* and *Gilman D. Blake,* of counsel), for defendant.

FORD, J. As alleged in his complaint the plaintiff on or about June 27, 1917, in New York paid to the defendant bank $30,225

upon its agreement to open an account with him in its Petrograd branch in Russia and to repay him there in rubles at the rate of twenty-three and one-quarter cents per ruble in such sums and at such times as he might by written order demand. Such an account was in fact opened and the plaintiff drew against it from time to time some 8,000 rubles before November 2, 1917. On or about that date the plaintiff directed the branch bank in writing to transfer 120,000 rubles to another institution in the city of Kharkoff, Russia, to his credit. The bank failed to comply with this order. Again on or about February 1, 1918, the plaintiff drew his check on the branch bank to the order of another for 122,000 rubles. On or about February 10, 1918, the agent attempted to present the check duly indorsed for payment but was unable to do so because the branch bank had previously been discontinued and closed and the defendant had ceased doing business in Russia without leaving any representative to whom the check could be presented for payment. On or about November 2, 1917, the ruble was worth fourteen cents and on or about February 10, 1918, thirteen cents in American money. No part of the balance on deposit has been paid and there remains due the plaintiff from the defendant $28,365, with interest. Judgment for that amount is demanded.

The answer after denying the material allegations of the complaint sets up an affirmative defense which is here attacked under rule 109 of the Rules of Civil Practice by a motion to strike out the defense as insufficient in law.

According to the allegations of the defense, the plaintiff during all the time embraced by the transactions was a citizen or subject of Russia. By permission of the federal reserve board the defendant opened a branch of its bank in Petrograd in January, 1917. Before doing any business in Russia it had to obtain permission from the Russian government and comply with sundry rules which it prescribed to the effect, among other things, that the settlement of litigations between the defendant and government officials or other persons arising out of the defendant's operations must be settled in Russian courts according to Russian law and that the discontinuance of its business in Russia should be subject to Russian law and the decisions of the Russian government then and thereafter in force. The Imperial Russian government was then in power.

In March, 1917, a revolution occurred resulting in the establishment of the Provisional Russian, or Kerensky, government. In November, 1917, there came a second revolution by means of which the Russian Federated Soviet Republic was established

" which thereupon became, has since been and is now the govern-
ment of that portion of the territory embraced in the former
Russian empire, including the city of Petrograd, in which the
defendant's said Petrograd branch operated, and has exercised
and now exercises the sole sovereign governmental authority
therein." In and after November, 1917, the Soviet government
decreed the nationalization of all joint stock banks operating in
Russia and seized possession of them, including the State Bank of
Russia, and decreed that all other banks should be merged in the
state which acting for the Soviet government took over all their
assets and liabilities, and that the temporary administration of the
affairs of private banks was intrusted to the board of the state
bank, acting for the Soviet government.

In its defense the defendant contends that the nationalization
decree and the acts done in its enforcement had the effect of
transferring the liability of its Petrograd branch to the plaintiff
over to the Soviet government acting through the State Bank.
All the assets of the branch bank were in fact delivered to the
State Bank. Those assets amounted to upwards of 240,000,000
rubles which the Soviet government has refused to return. Liabil-
ities to depositors including the plaintiff amounted to the same
figure. All this was accomplished by force of arms and the decrees
of the Soviet government were carried into effect by superior force
which it was impossible to resist " and which the plaintiff, as a
citizen or subject of Russia, was bound to respect."

In liquidating the confiscated banks the government failed to
collect the debts due the banks. The deposits were confiscated
as an " extraordinary revolutionary tax." The deposit account,
if any, of the plaintiff was " seized and confiscated by the govern-
ment and thereupon became its property; and all the right, title
and interest of the plaintiff therein and thereto, as against the
defendant, became divested."

The defense then goes on to allege that at the time the alleged
agreement was made with the defendant, " the plaintiff was fully
aware of the unsettled condition of Russia, and the probability
of political and governmental changes; and it was intended by the
parties that the said alleged agreement should be performed in
Russia and that the performance thereof should be governed by
the laws of Russia, and by any orders or decrees of any government
which might exercise authority in Russia or that part thereof
where the defendant's Russian branch might be situated."

Finally it is alleged in the defense under attack that the " means
of performance contemplated by the parties thereto of the alleged
contract between the plaintiff and the defendant relating to the

deposit account of the plaintiff in the defendant's Petrograd branch were destroyed by the said acts of the Soviet government and by superior force and through no fault, negligence or act of the defendant or of its Petrograd branch."

The identical allegations of the defense are also set up as a partial defense which is included in the present motion to strike out.

It is plain that the defendant alleges the existence of a government in Russia to which the attributes of sovereignty are ascribed. Whether that government has been recognized as a *de facto* or *de jure* government is a question which the defendant insists the court may not decide except from the language of the pleading alone. This position is untenable. The courts of this state have already decided that the Russian Socialist Federated Soviet government has not capacity to sue because it has never been recognized by the United States. It is also settled law that allegations in a pleading tending to show that a government is sovereign in character are not conclusive on demurrer but that the court is bound to take judicial notice of the fact as it exists in reality. To enable it to correctly determine the fact the courts may have recourse to such sources of information as they deem most trustworthy. *Russian Socialist Federated Soviet Republic* v. *Cibrario,* 198 App. Div. 869.

The Soviet government of Russia has never been recognized by our government; hence we may not ascribe any of the attributes of sovereignty to it. It follows that all the acts of that government in contemplation of American courts are ineffective without consent of the parties concerned to create, transfer or nullify legal obligations. So far as the defendant seeks to deduce such legal consequences from the decrees and activities of the Soviet government its defense is insufficient.

In *Gelston* v. *Hoyt,* 3 Wheat. 246, 324, the United States Supreme Court said: " No doctrine is better established, than that it belongs exclusively to governments to recognize new states in the revolutions which may occur in the world; and until such recognition, either by our own government, or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining unaltered. This was expressly held by this court in the case of *Rose* v. *Himely* (4 Cranch, 241) and to that decision on this point we adhere. And the same doctrine was clearly sustained by the judgment of foreign tribunals. (*The Manilla,* 1 Edwards R. 1; *The City of Berne* v. *The Bank of England,* 9 Ves. 347.) "

An English case (*Aksionairnoye Obschestvo A. M. Luther* v. *James Sagor & Co.,* L. R., 1 K. B. 456 [1921]) excellently illustrates the principle governing the force to be given to the acts of a

government that has not been recognized by the British government in a decision founded in part upon the authority of United States Supreme Court cases.

There certain products of a saw mill situated in Russia were confiscated by the Soviet government which purported to sell them to the defendant. The owners of the confiscated property sued for its possession. Upon the trial judgment was given to the plaintiffs upon the ground, as stated in the headnote, " that if a foreign government or its sovereignty is not recognized by His Majesty's government, the courts of this country [England] will not recognize such foreign government or its sovereignty, that on the facts the Russian Soviet government had not been recognized by His Majesty's government as the government of a Russian Federated Republic or of any sovereign state or power; that accordingly the court was unable to recognize any such Russian government or to hold that it had sovereignty or was able by its decree to deprive the plaintiff company of their property."

The case went to the Court of Appeal (L. R. 3 K. B. 532 [1921]) but in the meantime the Soviet government had been recognized as a *de facto* government by the British government. The case was reopened to admit proof of that fact and upon the new state of facts the decision of the lower court was reversed, although the ruling of the lower court was expressly approved as correct on the facts as they appeared at the time of trial. The reversal was placed upon the ground of the recognition of the Soviet government *de facto* as of a date anterior to the alleged confiscatory decree and that such recognition forbade the court to inquire into the validity of any of the acts of that government. The courts of this country recognize the same rule. *Oetjen* v. *Central Leather Co.,* 246 U. S. 297.

While this court may not recognize the Soviet government as sovereign and, therefore, possessing power to confiscate property or debts as must be done in respect of a foreign state which has been recognized either *de facto* or *de jure*, it does not follow that we must assume a state of anarchy in Russia. True by legal fiction, for some purposes which appertain more particularly to the other, the " political," branches of the government than to the judiciary, we must continue to assume that the old Imperial government is the only sovereign government in Russia.

Nevertheless, so far as the issues raised upon this motion are concerned, I can see no valid objection to permitting the defendant to allege and prove upon the trial the actual conditions prevailing

in that great country. Indeed we know as a matter of common knowledge that there is a government there which has been functioning in some fashion for five years or more and that it is not the Imperial government of the czars. Facts are facts in Russia the same as elsewhere.

The defense under attack here does allege political and governmental facts tending to show the impossibility of the performance of the contract. It was to have been performed in Russia and conditions prevailing there are pertinent to the controversy in my opinion. No case has been brought to my attention or revealed by diligent search which tends to negative this proposition.

The old English rule (*Paradine* v. *Jane*, Aleyn, 26) declaring that " when the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract," was made the law of this state as part of the common law by the state Constitution of 1777. That was the absolute rule here and in England down to about the middle of the nineteenth century when the case of *Taylor* v. *Caldwell*, 3 B. & S. 826 [1863], was decided. There the defendants agreed to give to the plaintiff the use of a music hall on certain specified days for the purpose of holding a series of concerts with no expressed stipulation against destruction by fire. Before the date of the first concert the music hall burned down. The plaintiff sued for damages for breach of contract.

Blackburn, J., delivering the judgment of the court, declared that " where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done; there, in the absence of any expressed or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor." A verdict was entered for the defendants accompanied by the declaration that both parties were excused from performance.

In *Krell* v. *Henry*, L. R. [1903], 2 K. B. 740, the Court of Appeal said: " Whatever may have been the limits of the Roman law, the case of *Nickoll* v. *Ashton Edridge & Co.*, L. R. [1901], 2 K. B. 126, makes it plain that the English law applies the principle not only to cases where the performance of the contract becomes impossible by

the cessation of existence of the thing which is the subject-matter of the contract, but also to cases where the event which renders the contract incapable of performance is the cessation or non-existence of an express condition or state of things, going to the root of the contract, and essential to its performance.  *  *  *  I do not think that the principle of the civil law as introduced into the English law is limited to cases in which the event causing the impossibility of performance is the destruction or non-existence of something which is the subject-matter of the contract or of some condition or state of things expressly specified as a condition of it.  I think that you first have to ascertain, not necessarily from the terms of the contract, but, if required, from necessary inferences, drawn from surrounding circumstances recognized by both contracting parties, what is the substance of the contract, and then to ask the question whether that substantial contract needs for its foundation the assumption of the existence of a particular state of things.  If it does, this will limit the operation of the general words, and in such case, if the contract becomes impossible of performance by reason of the non-existence of the state of things assumed by both contracting parties as the foundation of the contract, there will be no breach of the contract thus limited."

Another English case which is especially illuminating on the development of this doctrine of frustration of contracts is *Russkoe Obschestvo D'Lia, etc.*, v. *John Stirk & Sons*, 10 Lloyd's List, L. R. 214 [1922], decided in the Court of Appeal in February of this year.  There, the defendants during the war agreed to supply to the plaintiffs certain lathes.  The plaintiffs were a Russian company.  Government permits were necessary and one-third of the purchase price was to be paid when they were obtained.  The British government intervened and directed that the major part of the lathes be delivered in Japan or Scotland instead of to the plaintiff.  The suit was for the recovery of the initial payment made when the permits had been obtained.  The court below had attempted to make adjustment of the equities outstanding at the termination of the contract.  It was held that the doctrine of frustration applied and that moneys paid under it could not be recovered.  " Under those circumstances," says Lord Justice Bankes in that case, " the rule has always been that, in a case where an adventure or a contract comes to an end by reason of the doctrine of frustration, the loss remains where it has fallen; and so far as I know this is the first case, at any rate to which my attention has been called, in which anybody has endeavored to say that when applying the doctrine of frustration, the effect of which would be to bring a contract to an end, you can go a step further and imply

a term regulating what is to happen after the contract has been brought to an end by reason of this doctrine of frustration."

Another English case is deserving of consideration because it relates to a charter party which was held to have been frustrated on account of the indefinite detention of the vessel in a Russian port during the war. *Scottish Navigation Co., Ltd.,* v. *W. A. Souter & Co.,* L. R. [1917] 1 K. B. 222. In the Court of Appeal Swinfen Eady, L. J., declared at page 238: " The case comes within the principle of *Taylor* v. *Caldwell* [3 B. & S. 826], and *Appleby* v. *Myers* [L. R. [1867] 2 C. P. 651]. In *Taylor* v. *Caldwell* and in *Appleby* v. *Myers* the further performance of the contract had become absolutely and physically impossible, and not merely impossible in a commercial sense. In the former case the one party could not give to the other the use of a certain music hall, as it had been destroyed by fire. In the latter case the steam engine and machinery could not be erected upon and affixed to the defendant's premises unless these continued in a fit state to enable the work to be performed on them, and they had in fact been burnt down. Nevertheless the principle which was applied in these cases is not limited in English law to cases of physical impossibility. In *Krell* v. *Henry, supra,* it was quite possible for the plaintiff to give possession of the flat in Pall Mall for the occupation of which the defendant had agreed to pay. In that case Vaughan Williams, L. J., pointed out the wider application of the principle and said that it applied to cases where the event which renders the contract incapable of performance is the cessation or non-existence of an expressed condition or state of things going to the root of the contract and essential to its performance." *Chandler* v. *Webster,* L. R. [1904] 1 K. B. 493, is of like tenor.

In this state the development of the doctrine of frustration closely parallels the English cases as appears in *Stewart* v. *Stone,* 127 N. Y. 500, and the cases cited in that case. There the plaintiff's assignors agreed to deliver their milk at the defendant's factory to be manufactured into butter and cheese. The factory containing a quantity of their products was burned down. The court declared at page 507: " It is true that where an absolute executory contract is made, the contractor is not excused by inability to execute it caused by unforeseen accident or misfortune, but must perform or pay damages unless he has protected himself against such contingency by stipulation in the contract. (*Harmony* v. *Bingham,* 12 N. Y. 99; *Tompkins* v. *Dudley,* 25 id. 272; *Wheeler* v. *Connecticut Mut. L. Ins. Co.,* 82 id. 543.) But there may be in the nature of a contract an implied condition by which he will be relieved from such unqualified obligation, and when, in such case, without

his fault, performance is rendered impossible, it may be excused. That is so when it inherently appears by it to have been known to the parties to the contract, and contemplated by them when it was made, that its fulfillment would be dependent upon the continuance or existence at the time for performance, of certain things or conditions essential to its execution. Then in the event they cease, before default, to exist or continue, and thereby performance becomes impossible without his fault, the contractor is, by force of the implied condition to which his contract is subject, relieved from liability for the consequence of his failure to perform. (*People v. Bartlett*, 3 Hill, 570; *Dexter v. Norton*, 47 N. Y. 62; *Booth v. Spuyten Duyvil Rolling Mill Co.*, 60 id. 491; *Taylor v. Caldwell*, 3 B. & S. 826.)"

In *Lorillard v. Clyde*, 142 N. Y. 456, a contract was under consideration whereby the defendants had guaranteed to the plaintiff payment of dividends of not less than seven per cent upon the stock of a corporation in which both parties were interested. Before the seven years elapsed the corporation was dissolved by action of the attorney-general. Suit was brought upon the contract of guaranty for the period between the dissolution of the corporation and the end of the seven-year period. Chief Judge Andrews, writing for the court, after stating the general rule and citing a number of authorities, says: " When the executory contract relates to specific chattels, and the subject-matter is destroyed without fault of the party, the implied condition arises and excuses performance. But where the contract is based on the assumed existence and continuance of a certain condition, or upon the continuance of a subject-matter which, however, is not the direct object of the contract, is the principle in such cases excluded? The present case illustrates what we have in mind. The contract in question was not with the corporation whose life was extinguished by the judgment of dissolution. But the guaranty assumed that the corporation would continue in existence during the seven years period. The liability which the defendants assumed was in consideration of the benefits which might accrue to them from the management of the transportation business of the corporation during that period. Upon the assumption that the death of the corporation was brought about without their fault, were they thereafter bound? Is the doctrine of implied condition less applicable than it would be if the contract had been between the defendants and the corporation? If in the one case the contract, so far as it was unexecuted, would be terminated, did not the happening of the same event terminate the engagement of these parties, based on the assumed continuance of the corporation in life? There is in the present case, we think,

an element which strengthens the conclusion we have reached, that the obligation of the contract term'nated *prima facie* with the dissolution of the corporation. There is something more than an implied and wholly unexpressed condition that the corporation should continue in life during the seven years. It is the fair construction of the language of the contract itself. The contract was not *unilateral*. It contains mutual stipulations. These mutual stipulations by their terms look to the continuance of the corporation and the mutual obligations into which the parties entered are qualified by this understanding."

In *Dolan* v. *Rodgers*, 149 N. Y. 489, under a contract for building ten sections of a railroad, made with a railroad company, it was stipulated that no part of the contract should be sublet by the contractor without the consent of the other party. Four sections of the work were sublet without that consent. Both parties to the subcontract knew of the clause requiring the consent of the railroad company and that it had not been given. After two sections had been built by the subcontractor, the work was stopped by the railroad company under the clause requiring its consent to the subcontract. The subcontractor sued for a balance due on the work already performed. The defendant contested his claim upon the ground that he had failed to complete two of the sections embraced in the subcontract and claimed damages for failure to perform.

The court held that case came within the doctrine applied in *Lorillard* v. *Clyde, supra,* and that both parties were excused from further performance, but held that the contractor should pay the balance due on the work actually completed, saying, at page 495: " As, however, past performance was of value to the defendant, for he received compensation for it from the railroad company at a rate materially greater than the price he had agreed to pay the plaintiff, the law will not permit him to retain that advantage without paying for it."

A holdover tenant was excused from the payment of rent as for a term renewed, although he did not vacate the premises for fifteen days after his term expired on account of the serious illness of a member of his family. *Herter* v. *Mullen*, 159 N. Y. 28.

Where a railroad company had agreed to operate cars but was prevented by weather conditions from doing so it was excused from performance. *Buffalo & L. Land Co.* v. *Bellevue L. & I. Co.*, 165 N. Y. 247.

In a well-considered and erudite opinion in the Court of Claims (*Kinser Construction Co.* v. *State of New York*, 125 N. Y. Supp. 46; affd., 145 App. Div. 41; affd., 204 N. Y. 381) Judge Rodenbeck

traced the growth of the doctrine of frustration and applied it to the case before him " where in the course of the construction of a canal natural conditions of soil unexpectedly appear which contingency the contract does not in express terms cover, and which render the performance of the contract as planned impossible, and make necessary substantial changes in the nature and cost of the contract and substantially affect the work remaining under the contract, the law will read into the contract an implied condition when it was made that such a contingency will terminate the entire contract."

In *Columbus Trust Co.* v. *Moshier*, 51 Misc. Rep. 270; affd., 121 App. Div. 906; affd., 193 N. Y. 660, the defendant guaranteed payment to plaintiff's assignor of certain dividends semi-annually upon the shares of preferred stock then held by him in a manufacturing corporation, until the shares should be purchased from him. The period of the agreement was to be not over ten years. The payments were made under the contract for some two years, then stopped. Afterwards the corporation was dissolved through legal proceedings brought for that purpose by the state. The action was to recover the subsequent dividends alleged to be due. Mr. Justice Burr, writing for the court, said: " I think it clear that it was within the contemplation of both parties that the corporation should continue to exist during the life of the contract of guaranty and that an implied condition should be read into the contract to that effect."

In another case (*Whipple* v. *Lyons Beet Sugar Refining Co.*, 64 Misc. Rep. 363) the doctrine of frustration was invoked where by written contract the plaintiff, a farmer, agreed to grow eight acres of sugar beets and deliver them at a stipulated price to the defendant, a beet sugar company. The plaintiff properly sowed the seed on eight acres and complied strictly with the contract in their care and culture. There was a total failure of the crop on four acres because of drought. The contract provided that " in case of failure to live up to this contract any loss of beets is to be adjusted on a basis of $25 an acre * * * this to be regarded as liquidated damages for the breach thereof."

The cause of action arose in the town of Ridgeway, county of Orleans, and the case was tried at Albion, the county seat, before Mr. Justice Pound, then on the Supreme Court bench.

The question before the court was the construction of the provision requiring the payment of liquidated damages, and the eminent jurist, after quoting from *Herter* v. *Mullen*, *supra*, that " there are many cases where the courts have implied a condition in a contract to the effect that a party is relieved from its terms where its performance has, without his fault, become impossible," continues: " Thus, when the contract was to deliver 200 tons of a

particular crop of potatoes to be grown on a particular farm and, before delivery, the crop was destroyed by blight, it was held that, as the thing to be delivered was liable to perish, there was an implied condition that, if the delivery became impossible owing to the thing perishing without default of the seller, he would be excused. *Howell* v. *Coupland*, L. R. 9 Q. B. 462.

" The contract in suit is not a contract to deliver a certain quantity of beets absolutely; nor, on the other hand, is it, in terms, a contract to deliver a specific crop merely. The language is broad enough to be construed as an absolute agreement to grow eight acres of beets in the town of Ridgeway and deliver them to the defendant.

" Nevertheless, the contract is prepared on one of the defendant's printed forms and contains the minutest instructions for the defendant as to the proper soil, method of planting, cultivating, delivery, etc. Plaintiff has ' lived up to ' his contract by following all these instructions. The reasonable inference is that it was the performance of these conditions, only, that the parties had in mind when the stipulation for liquidated damages was made, and that the contract is one for a crop to be raised according to defendant's specific instructions and is subject to the implied condition that, if the seeds planted failed to grow on a portion of the land selected in accordance with such instructions by reason of drought, or other climatic conditions over which the plaintiff had no control, performance would be excused."

Mr. Justice Pound's decision was affirmed in the Appellate Division and in the Court of Appeals. 137 App. Div. 881; 202 N. Y. 522.

From the authorities cited it seems evident that the application of the doctrine of frustration is not limited to any class of cases or state of facts. Its application depends upon whether a person or thing or condition or state of things, upon the existence or continuance of which performance of the contract fundamentally depends, has ceased to exist, thus rendering performance impossible.

It seems to me that the defendant by the defense here in question shows enough to bring itself under the rule invoked. The contract was to have been performed in Russia so far as breach is claimed and the alleged breach occurred there. The defendant obligated itself to deliver through its branch bank in Petrograd certain commodities known as Russian rubles to the plaintiff on demand. A revolution occurred resulting in the creation of an irresistible power which completely dominated the place of performance and all persons, things and business transactions of that place. The bank and all its assets were confiscated by superior force and the further continuance of the branch bank and its transactions made impossible.

It cannot be said that the defendant having received the consideration in New York should, therefore, return it.   The action is in the nature of damages for failure to perform in Russia according to the agreement.   It is not a case of rescission *ab initio*.

The parties in effect united in a sort of joint enterprise.   The defendant agreed to take the plaintiff's money in New York, convey it to Russia by means of a transfer of credit probably and there complete performance of its contract.   It did in fact perform to the extent that it had the rubles on hand in Petrograd and it delivered them to the plaintiff as demanded so long as it was at all possible to do so.   It lost its investment in the enterprise and it seems to me the other adventurer must be held to have lost his also.

The rule that foreign law will not excuse performance, like every other sweeping dictum, has its limitations.   See *Scottish Navigation Co.* v. *Souter, supra*.   In any event it does not apply here.

In the first place we are not dealing with foreign law but a national debacle resulting in the obliteration of the means of performance of the contract.   Then, too, the very conditions which had their birth in the revolution operated upon the plaintiff so that it became impossible for him to make the demand upon the defendant which was necessary before it became legally obligated to make delivery.   It does not appear that any demand was made which was not promptly met.   Both parties found themselves equally helpless in the momentous governmental upheaval which had occurred.

The language of Chief Judge Andrews in *Lorillard* v. *Clyde, supra*, at page 463, applies here as it seems to me.   To paraphrase the words of the eminent jurist, there is something more than an implied and wholly unexpressed condition that the branch bank in Petrograd should continue in existence and operation until the equivalent in ruble value of the money paid by the plaintiff in New York has been drawn out by him in Petrograd.   It is the fair construction of the language of the contract itself.

At this point I take the liberty of expressing my entire sympathy with the views of an eminent English jurist on the needlessness of setting up an implied condition as the basis of the doctrine of frustration.   In the *Russkoe Case, supra*, decided in 1922, Lord Justice Atkin concurring with Lord Justice Bankes says, at page 216: " To my mind, if I may respectfully say so, it is a little unfortunate that this doctrine of the termination of a contract by reason of frustration should ever have been based upon the theory of an implied contract.   There are many positive rules of law imposed upon contracting parties which govern the whole creation, per-

formance, and dissolution of a contract which are quite independent of the intention of the parties. For my part I see no reason why, in a certain set of circumstances which the court finds must have been contemplated by both parties as being of the essence of the contract and the continuance of which must have been deemed to have been essential to the performance of the contract, the court should not say that when that set of circumstances ceases to exist, then the contract ceases to operate."

There are no equities outstanding in favor of either party to be adjusted. All that was done before frustration was rightfully done. The contract was merely terminated leaving the parties just as the events creating the impossibility of performance found them.

Moreover, I think the defense is saved from insufficiency upon another ground. It alleges that it was intended by the parties that the agreement should be performed in Russia and that the performance should be governed by the laws of Russia and by any orders or decrees of any government which might exercise authority in Russia or that part of it where the branch bank of the defendant might be situated.

The motion to strike out the defense as insufficient should be denied, with ten dollars costs. As to the partial defense I cannot say that it is insufficient in law in the view I take of the case and it too will be allowed to stand.

Ordered accordingly.