## BISSELL v. L. W. EDISON COMPANY.

1. CONTRACTS—ORIGINAL IMPOSSIBILITY OF PERFORMANCE.
   *Original* impossibility is impossibility of performance existing when the contract was entered into, so that the contract was to do something which from the outset was impossible.

2. SAME—SUPERVENING IMPOSSIBILITY OF PERFORMANCE.
   *Supervening* impossibility of performance develops after the inception of the contract.

3. SAME—IMPOSSIBILITY OF PERFORMANCE—FORESEEABILITY.
   Whether a promisor's liability is extinguished in the event his contractual promise becomes objectively impossible of performance may depend upon whether the supervening event producing impossibility was or was not reasonably foreseeable when he entered into the contract.

4. SAME—IMPOSSIBILITY OF PERFORMANCE.
   The party failing to perform a contract is exonerated, when, due to circumstances beyond the control of the parties, the performance of a contract is rendered impossible.

5. SAME—IMPOSSIBILITY OF PERFORMANCE—WORDS AND PHRASES.
   "Impossibility" means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 17 Am Jur 2d, Contracts § 404.
   Modern status of the rules regarding impossibility of performance as defense in action for breach of contract. 84 ALR2d 12.
[2, 5–7] 17 Am Jur 2d, Contracts §§ 404–424.
[3] 17 Am Jur 2d, Contracts § 406.
[8] 17 Am Jur 2d, Contracts §§ 3, 255.
[9] 17 Am Jur 2d, Contracts § 408.
[10] 17 Am Jur 2d, Contracts §§ 408, 412.
[11] 17 Am Jur 2d, Contracts §§ 404–406.
[12–14] 17 Am Jur 2d, Contracts § 447.

6. SAME—IMPOSSIBILITY OF PERFORMANCE.

The essence of the defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible.

7. SAME—IMPOSSIBILITY OF PERFORMANCE—RISK.

Risk of nonperformance of a contract should not fairly be thrown upon the promisor, if an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.

8. SAME—IMPLIED CONDITIONS—WORDS AND PHRASES.

"Implied conditions" are terms implied in a contract by force of the law itself, and not because the parties had them in mind.

9. SAME—IMPOSSIBILITY OF PERFORMANCE.

Conditions that render performance impossible do not terminate a contract *ab initio,* and do not vitiate what has been done and what remains to be done that is capable of execution; they do excuse performance only to the extent to which performance is impossible, and leave what has been done valid permitting a recovery therefor, and may not excuse performance of the remaining work.

10. SAME—IMPOSSIBILITY OF PERFORMANCE—DREDGING CONTRACT.

Performance of plaintiff's subcontract with highway contractor to furnish fill for highway building by dredging from river *held,* rendered partially impossible of performance, thus exonerating plaintiff from full performance, where plaintiff was compelled to shut down his dredging operation in the winter by the State highway department, after a water main that had been placed in the highway froze because it was inadequately protected from the weather, where the plaintiff had to keep his hydraulic dredging operation going constantly during freezing weather to prevent the river surrounding his dredge from freezing, plaintiff did not know, but defendant knew, that the highway department intended to lay the water main in such a place that it could freeze up during the winter, and plaintiff was unable to resume his fill operations pursuant to his subcontract until he was able to break up ice in the river in spring.

11. Same—Impossibility of Performance—Implied Conditions.

The law inserts into contracts a clause providing legal excuse from strict performance of the contractual promise in the event that unanticipated circumstances beyond the contemplation of the contracting parties and beyond their immediate control makes strict performance impossible.

12. Same—Waiver.

Waiver of a breach of contract must be a voluntary, intentional relinquishment of a known right.

13. Same—Waiver.

A waiver of a breach of contract may be shown by proof of express language of agreement or inferably established by such declarations, acts and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance.

14. Same—Waiver—Implied Waiver.

Act of defendant highway contractor in paying plaintiff subcontractor and his suppliers by 9 checks totalling more than $22,000 after a claimed breach of the contract by the plaintiff, and statement in affidavit to State highway department by defendant contractor that it owed plaintiff subcontractor approximately $24,000 for work performed, held, to amount to a waiver of the breach of contract by the plaintiff, if the actions of the plaintiff amounted to a breach of contract.

Appeal from Kent; Searl (Fred N.), J. Submitted Division 3 June 6, 1967, at Grand Rapids. (Docket No. 2,611.) Decided December 8, 1967.

Complaint by Wadsworth Bissell, trustee of the estate of Raphael Orlando Holcomb, bankrupt, against L. W. Edison Company, a partnership comprised of John S. Edison, Robert M. Edison and William H. Edison, for services rendered defendant in furnishing fill through dredging operations for a highway. Defendant counterclaimed alleging that plaintiff breached his contract forcing defendant to expend large sums of money in performing part of

plaintiff's work.   Judgment for plaintiff.   Defendant appeals.   Affirmed.

*Cochran, Vander Ploeg & Grimm (R. Bunker Rogoski,* of counsel), for plaintiff.

*Smith, Haughey & Rice (Sherman H. Cone,* of counsel), for defendant.

HOLBROOK, P. J.   Plaintiff brought this action on a subcontract for services rendered defendant in furnishing fill through dredging operations for a highway in Ottawa county, pursuant to the main contract of defendant with the State highway department.

Defendant filed a counterclaim alleging that plaintiff breached his contract forcing defendant to expend large sums of money in performing part of plaintiff's work.   Plaintiff denied the counterclaim and asserted conditions beyond his control excused any breach of the contract and defendant recognized the same and allowed plaintiff to perform as he was capable.

After trial without a jury, the court found for the plaintiff against the defendant in the sum of $14,152.72 plus interest from May 19, 1959.   This represented payment for the amount of fill furnished by plaintiff to defendant less credits for payments made.   The court also found that defendant had waived any claimed breach of contract by plaintiff and denied defendant relief.

Defendant has taken this appeal and raises for review one question restated as follows:

*Was defendant entitled to recover under its counterclaim for breach of contract?*

Substantial evidence was presented to justify the following pertinent facts:   On May 9, 1958, L. W. Edison Company, defendant, contracted with the

State highway commissioner to construct highway approaches both north and south of the Grand river bridge on relocated US 31. The contract called for among other things the placing of 152,698 cubic yards of fill material on the right-of-way south of the bridge and 245,021 cubic yards of fill to be placed on the right-of-way north of the bridge. On July 19, 1958, defendant entered into a subcontract with plaintiff whereby plaintiff agreed to furnish and place a minimum of 350,000 cubic yards of soil at 45 cents per cubic yard in partial performance of defendant's contract with the State. The subcontract provided that the highway department's proven figures would be final measurement as to quantities. Plaintiff was to furnish the fill from the river bed of the Grand river by use of a dredge by hydraulic method.

Plaintiff started operations in the fall of 1958 on the south approach to the bridge. Work progressed satisfactorily until the week of December 4, 1958, when a water main that had been placed over the bridge to serve a boiler froze, and plaintiff's operations were stopped by the highway department until the water main was thawed out or repaired. Mr. R. M. Edison, one of the partners of defendant, testified by way of a deposition that he knew in May of 1958 that the State planned to place the water main in the right-of-way over the bridge. He had discussed this matter with the State and thought he had convinced them that it would be better to wait until after the fill material had been placed. He did not know the water main was placed in the right-of-way until January of 1959 when plaintiff was shut down. The fact that the highway department intended to place the water main in the right-of-way was not stated in defendant's contract nor in the State's specifications. The plaintiff had no knowledge at the time he entered into the subcontract with

defendant that a water main would be constructed in the right-of-way where he agreed to place fill material.

Mr. Holcomb testified that during freezing weather it is necessary to keep the hydraulic operations going 24 hours a day in order to prevent the river surrounding the dredge from freezing. He said he was shut down by the highway department for 30 days commencing in December of 1958 because the water main froze up. Mr. Holcomb was not even allowed to start up his operations to flush out his line and as a result, 8 lengths of his pipe froze solid. Thirty inches of ice formed in the river while plaintiff was shut down preventing further operations by plaintiff, until spring. He also testified that the water main was placed on the ground with little earth covering it and that such exposure was the cause of the freeze up.

Defendant hauled by truck some 50,000 cubic yards of fill to the bridge location in May, June, July, and the forepart of August, 1958. Later in 1959, after the freeze-up, defendant hauled all the fill material by truck to complete the north approach to the bridge.

Defendant had contracted with Paas Brothers and Mr. and Mrs. Jack D. Robinson to obtain borrow earth from their pits. Defendant's contract with Paas Brothers was dated June 23, 1958, and stated in part:

"Whereas, the first party is a contractor and in requirement of 400,000 yards of sand or thereabouts, and,

"Whereas, second parties have available the right to remove and furnish such sand, * * *

"1. First party agrees to buy such sand at a rate of 3 1/4 cents, per cubic yard to be measured at the bridge site by a qualified representative of the State highway department."

¹ Defendant's contract with Mr. and Mrs. Jack D. Robinson was undated but mentions the job in question. The contract states in part as follows:

"It is further understood and agreed by and between the parties hereto that there are some previously filled areas along the said new highway US 31 and that the said party of the second part has previously contracted and/or become obligated to accept a certain *undetermined* amount of fill from the Holcomb Construction Company to be dredged from Grand river and has further contracted and/or become obligated to purchase and accept a certain amount of fill from lands and premises situated in the township of Spring Lake, county of Ottawa and State of Michigan owned by one Alex Marciniak, the said lands and premises owned by Alex Marciniak being situated to the north of and abutting the above described lands and premises owned by the parties of the first part." (Emphasis supplied.)

It is evident that this last contract was made subsequent to the contract with Paas Brothers and the subcontract with plaintiff Holcomb. It is reasonable to believe it was made after the freeze-up for defendant quoted in the contract that he was obligated "to accept a certain *undetermined* amount of fill from the Holcomb Construction Company to be dredged from Grand river." (Emphasis supplied.)

In apparent conformance with an understanding between the parties, plaintiff commenced operations to break up the ice in the river in the early part of March, 1959, and recommenced his fill operations Saturday, March 21, continuing until the middle of May, 1959, when the total fill job was completed.

Defendant's records indicate that it did not deem the subcontract breached for defendant paid plaintiff and his suppliers 9 checks totaling $22,498.28 subsequent to the alleged breach.

Plaintiff asserts, in reference to the issue before this Court on review, that there was no breach of the contract between himself and defendant for the reason that complete performance was impossible, and this condition was not brought about by any act or failure to act on his part. The facts in this case support the plaintiff in this contention, *i.e.*, defendant knew in May of 1958 at or about the time of signing its contract with the State, and about 2 months prior to entering into contract with plaintiff that the highway department planned to place a water main over the bridge and in the right-of-way where defendant was to place fill material. Though defendant attempted to convince the State that such water line should not be constructed on the job until after the fill work had been completed, this could not excuse defendant's failure to explain to plaintiff the plans of the highway department, that plaintiff in furnishing and placing fill on the job might have to contend with a water main in the right-of-way. Without this information, plaintiff was totally ignorant of a very material condition that he might face in performing his contract. The water main was placed under the direction of the highway department in August or September of 1958 in the right-of-way.

When freezing weather came, the inevitable happened—the water pipe froze because it was not covered with sufficient earth. Plaintiff had not been informed that a water main would be placed in the right-of-way where he was to work. If he had been so informed, and had also been informed that his ability to operate 24 hours a day to prevent his dredge from freezing in the river was contingent upon the water main being kept open, he may have declined the contract or charged more for his work to cover the risk.

Absent a case directly on point in this jurisdiction, we turn to 84 ALR2d 12, § 5, pp 31, 32 for light concerning the law applicable and find the following:

"Impossibility of performance may be classified as original impossibility or supervening impossibility. The former is impossibility of performance existing when the contract was entered into, so that the contract was to do something which from the outset was impossible; whereas *supervening impossibility is that which develops some time after the inception of the contract.*" (Emphasis supplied.)

Section 6, p 39, states:

"According to many authorities, whether a promisor's liability is extinguished in the event his contractual promise becomes objectively impossible of performance may depend upon whether the supervening event producing such impossibility was or was not reasonably foreseeable when he entered into the contract. Although of limited applicability (since it quite evidently does not apply to instances of supervening illness or death of a person whose personal performance is required, and perhaps in some other instances), the test based on reasonable forseeability would appear to be supported by reason[1] and of practical working value to the courts."

Section 9, p 51, states in part:

"According to a modern District of Columbia case, 'it is well settled that when, due to circumstances beyond the control of the parties the performance of a contract is rendered impossible, the party failing to perform is exonerated.' *Whelan v. Griffith Consumers Co.* (1961, Mun Ct App DC), 170 A2d 229, *infra*, § 20[d]. * * *

---

[1] See, in this respect, the terms of 2 Restatement of Contracts, § 457, quoted *infra*, § 9, which refers to "facts that a promisor had no reason to anticipate."

"When considering the modern version of the rule as to supervening impossibility found in section 457 of the Restatement of Contracts, *supra,* it must be recognized that in the Restatement 'impossibility' means (as stated in section 454) 'not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'     See generally section 11, *infra.*

"Williston states: 'As pointed out in the Restatement of Contracts [section 454, quoted *supra*], the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible.  *  *  * The true distinction is not between difficulty and impossibility.  A man may contract to do what is impossible, as well as what is difficult, and be liable for failure to perform.  *The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.  If so, the risk should not fairly be thrown upon the promisor.'*  6 Williston, Contracts (Rev ed), § 1931."  (Emphasis supplied.)

Impossibility of performance has been considered and treated in many legal treatises.  Of particular importance concerning partial impossibility which is present in the case at hand, we turn to 6 Williston, Contracts (Rev ed), § 1956, wherein on pp 5487, 5488, the authors state as follows:

"In an instructive opinion in a lower court in New York,[2] while using the prevailing terminology of

[2] *Kinser Construction Company* v. *State* (1910), 125 NYS 46, 54 (Ct Cl), aff'd 145 App Div 41 (129 NYS 567), aff'd 204 NY 381 (97 NE 871).

implied conditions, Rodenbeck, J., recognized that 'these terms are implied in the contract by force of the law itself, and not because the parties had them in mind. Whether we approve of their insertion upon the theory that had the attention of the parties been called to the conditions giving rise to the application of the rule, they would have omitted any reference to them because obviously covered by the law, or upon the theory that they would have regarded them as just provisions to have inserted.'

"Since the qualification of the literal terms of the promise is imposed by the law, on principles of justice, not because of the expressed intention of the parties, the extent of the qualification depends merely on what is just. 'The conditions that rendered performance impossible do not terminate the contract *ab initio,* and vitiate what has been done and what remains to be done that is capable of execution. The conditions may be of such an extent as to amount to a substantial abrogation of the entire contract, or they may relate to an insignificant part of the contract, but they excuse performance only to the extent to which performance is impossible, and leave what has been done valid permitting a recovery therefor, and may not excuse performance of the remaining work. No general rule can be laid down which will apply to all cases, but each case must be decided upon its own facts, and that this course can be taken and justice done according to the facts in each case unhampered by written rules is due to the great flexibility of the common law which is its chief merit.' "

Under the facts in this case, we conclude that impossibility of partial performance was present and plaintiff is excused from performing in strict compliance with his contract.

The trial court did not specifically find a breach of the contract by plaintiff but ruled that defendant had waived any claimed breach. Such ruling necessarily implies a finding that an existing contract

was breached. The sole question posed by this finding is whether or not the breach is excused legally by either its waiver or by impossibility of performance. Figuratively speaking, the law inserts into contracts a clause providing legal excuse from strict performance of the contractual promise in the event that unanticipated circumstances beyond the contemplation of the contracting minds and beyond their immediate control make strict performance impossible.

Defendant cites many cases concerning the general rule that a waiver of a breach of contract must be a "voluntary intentional relinquishment of a known right."[3] We agree with this statement of the law.

In the case of *Strom-Johnson Construction Co.* v. *Riverview Furniture Store* (1924), 227 Mich 55, Mr. Justice STEERE stated in part on pp 67, 68 as follows:

"A waiver may be shown by proof of express language of agreement or inferably established by such declarations, acts and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance."

In the case at hand, we do not have a specific statement by a representative of defendant to the plaintiff that defendant waived any claimed breach of the contract. However, we do have declarations, acts and conduct of defendant which are inconsistent with the purpose to exact strict performance which constitutes a waiver.

An important method of waving a breach of contract is set forth in one of the cases cited by defendant, *Hall* v. *Gargaro* (1945), 310 Mich 693, wherein

[3] *Don-Ray Tool & Die, Inc.*, v. *John Hancock Mutual Life Ins. Co.* (1966), 5 Mich App 263, 267.

on p 702, Mr. Justice BOYLES stated in part as follows:

"While we recognize the advantage afforded the trial court in seeing and hearing witnesses, on this record there is no issue of credibility of witnesses, and the testimony of the parties and their witnesses, as well as the exhibits received, clearly preponderate in favor of the defendant, that the defendant did not at any time agree to waive his claims for damages, *or agree to pay plaintiff $1,539.90 in full settlement."* (Emphasis supplied.)

The defendant in the instant case through one of its copartners made an affidavit which was filed with the highway department which unequivocally stated:

"At the present time we owe R. O. Holcomb $24,000 approximate. He is suing us for about $200,000. We tried to settle with him but to no avail. We used Michigan State highway department quantities in figuring what we owed him."

The disposition of the matter whether based on the theory of impossibility of performance or waiver of any claimed breach of contract is sufficiently supported by the evidence.

The judgment of the trial court is affirmed. Costs to appellee.

BURNS AND WISE, JJ., concurred.