*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

THE BEST TEAM EVER, INC.,

        Plaintiff-Appellant,

v

CONLAN ABU, RYAN MOORE, and JAMES
TERRENCE MOORE II,

        Defendants-Appellees.

UNPUBLISHED
September 30, 2025
11:51 AM

No. 368946
Oakland Circuit Court
LC No. 2023-198922-CB

---

CONLAN ABU, RYAN MOORE, and JAMES
TERRENCE MOORE II,

        Plaintiffs/Counterdefendants-
        Appellees/Cross-Appellants,

v

STANLEY B. DICKSON, JR., THE EPICUREAN
GROUP, EPIC CATERING & EVENTS, INC.,
TROWBRIDGE CATERING, INC., MILK &
HONEY DETROIT, INC., NO. VI CHOPHOUSE
DETROIT, INC., TROWBRIDGE CHOPHOUSE,
INC., NOMAD GRILL, INC., TROWBRIDGE
NOMAD, INC., NORTHERN LAKES SEAFOOD
RESTAURANT, INC., TROWBRIDGE
NORTHERN, INC., PLAZA DELI SOUTHFIELD,
INC., TROWBRIDGE DELIS SOUTHFIELD,
SOUL CAFÉ, LLC, TROWBRIDGE SOUL, and
THE BEST TEAM EVER, INC.,

        Defendants/Counterplaintiffs-
        Appellants/Cross-Appellees,

and

No. 370769
Oakland Circuit Court
LC No. 2019-175483-CB

-1-

MILLERS BIG RED ORCHARD, LLC, BROB,
LLC, BROF, LLC, and BROL, LLC,

Counterdefendants.

Before:  LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

These consolidated appeals[1] arise from the sale of several restaurants and catering businesses, the contractual obligations and assignments, and the promissory note.  In Docket No. 370769, defendants/counterplaintiffs,[2] (collectively, "sellers"), appeal as of right the final judgment entered after a jury verdict in favor of plaintiffs/counterdefendants,[3] (collectively, "purchasers").  Purchasers also cross-appeal as of right the final judgment.  Sellers' issues on appeal contest the trial court's rulings in posttrial orders, and purchasers' cross-appeal relate to pretrial orders, in the first case between these parties, Lower Court No. 2019-175483-CB ("the 2019 case").

In Docket No. 368946, plaintiff, The Best Team Ever, Inc. ("Best Team"), appeals as of right the trial court order granting defendants, Conlan Abu, Moore, and James (also "purchasers"), summary disposition.  In this appeal, Best Team claims a subsequent breach of the same promissory note in the case filed in 2023, Lower Court No. 2023-198922-CB ("the 2023 case").  In each appeal, we affirm.

## I.  FACTUAL BACKGROUND

These cases arise from the sale of a restaurant group from sellers to purchasers under an asset purchase agreement (APA), executed January 1, 2019.  Conlan Abu is a corporation, owned by Moore and his wife.  James is Moore's father.  Dickson is the owner or member of the business

---

[1] *The Best Team Ever, Inc v Conlan Abu*, unpublished order of the Court of Appeals, entered September 26, 2024 (Docket Nos. 368946 and 370769).

[2] The defendants/counterplaintiffs are Stanley B. Dickson, Jr., The Epicurean Group, Epic Catering & Events, Inc., Trowbridge Catering, Inc., Milk & Honey Detroit, Inc., No. VI Chophouse Detroit, Inc., Trowbridge Chophouse, Inc., Nomad Grill, Inc., Trowbridge Nomad, Inc., Northern Lakes Seafood Restaurant, Inc., Trowbridge Northern, Inc., Plaza Deli Southfield, Inc., Trowbridge Delis Southfield, Soul Café, LLC, Trowbridge Soul, and the Best Team Ever, Inc. ("Best Team") and will be collectively addressed as "sellers."

[3] The plaintiffs/counterdefendants are Conlan Abu, a corporate entity, Ryan Moore (Moore) and James Terrence Moore II (James) and will be collectively addressed as "purchasers." Counterdefendants, Millers Big Red Orchard, LLC; BROB, LLC; BROF, LLC; and BROL, LLC are not direct participants in either appeal.

entities that make up the restaurant group, The Epicurean Group. Dickson is the sole shareholder of Best Team, an employee leasing company that provides employees to the restaurants and catering businesses.

In 2017, while living in California, Moore was approached about purchasing Millers Big Red Orchard, a farm and apple orchard in Michigan. Moore put together a business plan to acquire a restaurant group, use the farm to make a farm-to-table operation, and produce hard cider. Moore was introduced to Dickson and his son, Will Dickson (Will), in February 2018, and started negotiating. Dickson did not own the brick-and-mortar locations of each restaurant or catering company in the group; rather, he owned the management agreements between the restaurants and the facilities where they were located. Moore wanted to purchase this infrastructure, so he moved to Michigan in 2018, to pursue the opportunity.

Moore was aware that each management contract had an assignment clause requiring that the facility owner give consent for the contract to be transferred by the manager, i.e., the restaurant group, to a third party. But Moore did not see copies of the management contracts until December 27 or 28, 2018. Moore was assured that Dickson would obtain the consents because he was on good terms with all of the owners. Dickson countered that Moore did not want the consents because Moore wanted to negotiate better terms. On December 31, 2018, Dickson e-mailed Moore indicating that the consents to the assignments would be obtained after the closing. The parties agreed to a $1 million purchase price, and closed on the APA on January 1, 2019. Relevant provisions of the APA provided as follows:

**1. Agreement to Purchase and Sell.**

1.1 **Assets Purchased and Sold.** At the Closing (as defined in this Agreement), subject to the performance of the duties set forth below, Purchaser shall buy, and Seller shall sell, assign, convey, transfer, set over, and deliver (by appropriate instrument of transfer) to Purchaser all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Closing Date (as defined in this Agreement) are owned by Seller or in which Seller has an interest of any kind in relation to the Business. These include, without limitation, the following, (excluding, however, those assets specifically identified in this Agreement as the "Excluded Assets") (collectively, the "Purchased Assets"):

\* \* \*

F. **Contracts.** All contracts and service agreements ("Contracts") shall be delivered and assigned by Seller to Purchaser at the Closing.

\* \* \*

**7. Representations, Covenants, and Warranties of Seller.**

Seller and Owner (as evidenced by the signature of Owner) to the best of their knowledge and with due inquiry, represent, covenant, and warrant the following to be true, which representations, covenants, and warranties shall survive the Closing:

-3-

* * *

      7.7 **Status of Contracts.** Seller has, to the best of Seller's knowledge, complied with all of the provisions of contracts described in this Agreement and of all other contracts and commitments to which Seller is a party.

Section 13 of the APA included an indemnity clause, and provided that each party would "defend, indemnify, and hold harmless" the other party in the event of a breach of any warranty in the APA, or for the failure to perform in full any covenant or condition under the APA. Moore signed the APA on behalf of Conlan Abu, and Dickson signed it in his capacity as owner or member of each individual entity.

      On the day of closing, Moore wired a $550,000 down payment to Dickson, and a promissory note was executed for the remaining $450,000. The promissory note was amended shortly after closing to $750,000, after an inventory was taken of the food, wine, and alcohol at the restaurants. The promissory note incorporated by reference a security agreement also dated January 1, 2019, in which Conlan Abu, the purchased entities, and the orchard entities, granted Best Team a security interest in substantially all of the assets sold under the APA. This note required monthly payments of $9,911 with 10% interest to the note holder, Best Team.

      Shortly after closing, Dickson asked Moore for additional funds to cover the payroll of the restaurant and catering company employees from mid-December 2018, through the new year, and Dickson would reimburse Moore. Moore agreed and paid the employees through Conlan Abu. Moore testified that the amount was $180,000, but at trial, this amount was limited to $86,500, based on purchasers' pleadings.

      Moore ran the businesses from January 2019 to July 2019. He testified that he personally contributed approximately $400,000 for payroll, sales tax, and inventory. He tried to sell his interests or obtain financing or other investors for the restaurant group, but was unsuccessful. Moore testified that he never received the consents to assignment of the management contracts and started having issues with the owners. He approached Dickson and Will in June 2019, to obtain the consents, but Dickson and Will denied this.[4] Thus, on July 15, 2019, Moore sent Dickson a demand letter, informing sellers that they failed to deliver the consents and assignments as required under the APA, and demanding that sellers fulfill this obligation within five days. In response, Dickson provided two consents to assignments, although one had terms contrary to the APA. Dickson did not provide the remaining consents. On July 18, 2019, purchasers sent sellers another letter indicating they were tendering back the assets. On July 20, 2019, Moore e-mailed all the restaurant and catering company employees, informing them that they were terminated.

---

[4] In June 2019, Conlan Abu also purchased Big Red Orchard, and created entities BROB, BROF, and BROL, as part of the expansion plan.

-4-

## II. PROCEDURAL HISTORY

### A. THE 2019 CASE

Purchasers filed suit against sellers, alleging breach of the APA, entitlement to rescission, and fraud, misrepresentation, and negligent misrepresentation against Dickson. Sellers counterclaimed, alleging breach of the promissory note and security agreement on behalf of Best Team, conversion, tortious interference, breach of the APA, and fraudulent inducement. When sellers moved for a more definite statement of purchasers' claims against Dickson individually, the court limited purchasers' fraud and misrepresentation claims to Dickson's December 31, 2018 e-mail indicating he would obtain the consents to assignment postclosing. Purchasers then filed a first amended complaint to expand these allegations against Dickson, and alleged the same counts of breach of the APA and rescission against sellers, and fraudulent misrepresentation, estoppel, negligent misrepresentation, and unjust enrichment against Dickson individually. Sellers also filed a first amended counterclaim, raising the same claims as their original complaint.

Both parties moved for summary disposition. The court denied purchasers summary disposition of their breach-of-contract claim based on § 1.1, and granted sellers summary disposition for all of the contracts except one. The court found that questions of fact existed whether § 7.7 of the APA was breached by sellers, denied purchasers summary disposition in that regard, and declined to address purchasers' estoppel argument.

The court granted Dickson summary disposition of purchasers' breach-of-contract claim against him personally because he did not sign the APA in his individual capacity. The court granted Dickson summary disposition of purchasers' fraud and misrepresentation claims because they were barred by the merger clause of the APA, but denied sellers summary disposition of purchasers' unjust-enrichment claim. Both parties moved for reconsideration of the trial court's order, which the court denied.[5]

The trial court then entered an opinion and order granting in part and denying in part purchasers' motion for partial summary disposition on sellers' counterclaims for conversion, fraudulent inducement, and tortious interference. The court determined that questions of fact existed regarding sellers' conversion claim related to wine inventory at the restaurants, and sellers' fraudulent-inducement claim related to entering the APA based on Moore's business plan. However, the court granted purchasers' summary disposition of sellers' tortious-interference claim related to real estate leases between the restaurants and their landlords. To the extent they did not prevail, purchasers moved for reconsideration of this order, but it was denied.

Purchasers then moved to file a second amended complaint, seeking, in part, to "expand the scope" of their unjust-enrichment claim against Dickson individually regarding the advanced payroll. Purchasers argued that the court had ruled Dickson was not a party to the APA, that written agreement did not preclude their unjust-enrichment claim, and the court could pierce the

---

[5] Purchasers applied for delayed leave to appeal the trial court's summary-disposition order, which this Court denied. *Conlan Abu v Dickson*, unpublished order of the Court of Appeals, entered March 2, 2022 (Docket No. 360313).

corporate veil to find Dickson liable. The court denied purchasers' motion, and denied purchasers' motion for reconsideration of its decision. After the case was reassigned to another circuit court judge in April 2022, purchasers sought to revisit certain rulings. The successor judge denied purchasers' motion as procedurally improper.

The 2019 case proceeded to a nine-day jury trial on the remaining issues: (1) purchasers' breach-of-contract claim under § 7 of the APA, (2) purchasers' unjust-enrichment claim against Dickson individually, and sellers' counterclaims for (3) breach of the APA, (4) breach of the promissory note, (5) breach of the security agreement, (6) conversion of the wine inventory, and (7) fraud. The court advised the jury that the management agreements were assigned as a matter of law at closing under the APA, so breach of § 1.1 was not at issue. The jury found that purchasers proved liability of sellers for breach of the APA and unjust enrichment, and awarded purchasers $1,100,600 in damages. The jury found that sellers did not prove liability on their counterclaims for breach of the APA, breach of the promissory note, breach of the security agreement, conversion, or fraud, and awarded no damages.

Posttrial, sellers moved for judgment notwithstanding the verdict, and separately, in the alternative, for a new trial or remittitur. Sellers argued that they were entitled to judgment of purchasers' breach-of-contract claim under § 7.7 of the APA because purchasers waived this claim by proceeding to closing knowing the consents to assignments had not been obtained, and because purchasers failed to prove that breach of § 7.7 caused any damages. Sellers also argued that Dickson was entitled to judgment notwithstanding the verdict of purchasers' unjust-enrichment claim because the subject matter of the claim was covered by the APA, and the claimed damages lacked evidentiary support. Sellers argued they were entitled to a new trial based on an alleged instructional error regarding waiver, arguing that the instruction improperly provided that waiver requires additional consideration. Sellers argued the damages award was excessive because purchasers ultimately received $5 million in COVID-relief funds, and that purchasers' damages should be remitted to $0.

The court denied judgment notwithstanding the verdict, concluding that

(1) [purchasers] did not waive the breach of Section 7.7 of the APA, (2) there was no evidence of waiver, (3) the APA preserved the claims for breach of warranty and indemnity, and (4) the evidence showed [sellers'] post-closing obligation to deliver consents for the assignments in accordance with Section 7.7 of the APA. Furthermore, this Court did not err by using the standard jury instruction [M Civ JI] 142.41 on waiver.

The court also concluded that purchasers proved they suffered damages as a result of the breach, and that a reasonable jury could find that Dickson was unjustly enriched. The court denied sellers' motion for a new trial, again finding no merit to sellers' arguments regarding waiver or instructional error, and further concluding that the damage award was supported by the evidence. A final judgment in purchasers' favor was entered, and sellers now appeal the trial court's posttrial rulings, and purchasers cross-appeal its pretrial rulings, in the 2019 case.

## B. THE 2023 CASE

While the 2019 case was still pending but after the completed jury trial, Best Team filed the 2023 case. On February 21, 2023, Best Team filed a complaint against purchasers alleging that they breached the promissory note by failing to make the monthly payment in December 2022. Purchasers had advised they would not be making additional payments because this issue was litigated in the 2019 case. Best Team claimed this constituted a new breach because purchasers' default occurred after the trial concluded.

Purchasers responded to the complaint by moving for summary disposition under MCR 2.116(C)(6) (another action initiated between the same parties involving the same claim) and (C)(7) (claim barred by res judicata). Purchasers argued the case should be dismissed because this issue was already litigated in the 2019 case between the same parties. Purchasers also relied on the jury conclusion that, because sellers breached the APA, no further amounts were owed under the APA or the note, and the resolution of this claim would require examination of the same operative facts. Purchasers further asserted that, once final judgment was entered in the 2019 case, Best Team's claim would be barred by res judicata.

In contrast, Best Team alleged the 2023 case was not based on the same operative facts as the 2019 case and payment default of the promissory note was not litigated in the 2019 case, but occurred after trial concluded. Best Team also asserted the court rejected the argument that if the jury found sellers committed the first material breach then purchasers were excused from future obligations on the note. The promissory note was a separate agreement from the APA.

The trial court granted summary disposition to purchasers under MCR 2.116(C)(6) because the 2019 case was pending at that time and concerned the same parties and substantially the same claims. The court concluded that the 2023 case did not arise out of different operative facts than the 2019 case and that the promissory note incorporated by reference the APA. Because sellers' rights were extinguished under the APA by committing the first material breach, Best Team had no right to payment under the note. The court denied purchasers summary disposition under MCR 2.116(C)(7) because the final judgment referenced above had not yet been entered in the 2019 case, so res judicata did not apply. Best Team moved for reconsideration, which the trial court denied. Best Team now appeals.

## III. DOCKET NO. 370769

## A. DIRECT APPEAL

Sellers' first two arguments on direct appeal arise from the trial court's posttrial rulings on their motion for judgment notwithstanding the verdict under MCR 2.610. A trial court's decision on a motion for judgment notwithstanding the verdict is reviewed de novo. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). "The appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id*. (quotation marks and citation omitted). Judgment notwithstanding the verdict is "improper where reasonable minds could differ on issues of fact." *Clemens v Lesnek*, 200 Mich App 456, 461; 505 NW2d 283 (1993) (quotation marks and citation omitted).

-7-

This Court reviews de novo claims of instructional error. *Lewis v LeGrow*, 258 Mich App 175, 211; 670 NW2d 675 (2003). For preserved claims of instructional error, reversal is only warranted when the failure to do so would be inconsistent with substantial justice. *Komendat v Gifford*, 334 Mich App 138, 149 n 2; 964 NW2d 75 (2020). MCR 2.512(D)(2) provides that the trial court must give a jury instruction if a party requests it, and it is applicable to the case. This Court reviews the trial court's determination whether a standard jury instruction is applicable for an abuse of discretion. *Lewis*, 258 Mich App at 211. "An abuse of discretion occurs when a trial court's decision is not within the range of reasonable and principled outcomes." *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 347 Mich App 533, 557; 15 NW3d 357 (2023) (quotation marks and citation omitted).

## 1. BREACH OF CONTRACT

Sellers contend that the trial court erred by denying their request for judgment notwithstanding the verdict, claiming that purchasers' breach-of-contract claim was waived and there was insufficient evidence that purchasers suffered damages. We disagree.

### a. WAIVER

Specifically, sellers argue that purchasers waived their claim for breach of contract because (1) Moore proceeded to closing knowing the consents to assignments were not obtained, (2) the APA provision that its representations "survive the closing" did not revive any waived claims, and (3) despite the court's jury instruction to the contrary, purchasers' waiver did not require separate consideration.

A waiver is the intentional relinquishment or abandonment of a known right. *Patel v Patel*, 324 Mich App 631, 634; 922 NW2d 647 (2018). "Waiver is a mixed question of law and fact. The definition of a waiver is a question of law, but whether the facts of a particular case constitute a waiver is a question of fact." *Id.* (quotation marks and citation omitted). The party asserting waiver bears the burden of proof. *Id.* "Magic words are unnecessary to effectuate a valid waiver, but a waiver must be explicit, voluntary, and made in good faith." *Id.* To determine whether a waiver occurred, the court must address whether a reasonable person would have understood that he or she was waiving the interest. *Id.* "[A] valid waiver may be shown by express declarations or by declarations that manifest the parties' intent and purpose, or be an implied waiver, evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Id.* (quotation marks and citations omitted).

Under the APA, sellers were required to assign the management contracts with each restaurant or catering business owner to purchasers. Section 1.1 provided that at closing, sellers would sell, assign, convey, transfer, set over, and deliver all of its assets, rights, and interests in relation to the restaurant and catering businesses, including all contracts and service agreements under § 1.1(F). The court ruled before trial that the management contracts were assigned as a matter of law under § 1.1 of the APA despite the lack of consent to each assignment by the owners. Thus, purchasers' sole breach-of-contract claim at trial was premised on § 7.7 of the APA, which provides: "**Status of Contracts.** Seller has, to the best of Seller's knowledge, complied with all of the provisions of contracts described in this Agreement and of all other contracts and commitments to which Seller is a party." Section 7.23 provides that "[t]he foregoing

representations and warranties are made by Seller with the knowledge and expectation that Purchaser is placing complete reliance on them." Thus, § 7.7 governed the effectual transfer of the assignments, see § 1.1 and § 1.1(F), from sellers to purchasers reflecting that the consents from the owners were acquired.

This Court addressed contractual waiver in *Bissell v LW Edison Co*, 9 Mich App 276, 279-280; 156 NW2d 623 (1967).[6] In *Bissell*, the defendant contracted with the state highway commission to construct highway approaches along a bridge, and the defendant subcontracted with the plaintiff to place fill along the right-of-way north and south of the bridge. After the plaintiff started the work, the state placed a water main in the south right-of-way, it froze in the winter, and the plaintiff had to stop his work. *Id*. at 280. A representative of the defendant testified that he knew the state planned to place the water main there, but the plaintiff had no knowledge of such when he entered the subcontract with the defendant. *Id*. at 280-281. When the plaintiff sued to recover, the defendant counterclaimed for breach of contract, and the trial court found that the defendant waived any breach claim. *Id*. at 279. This Court affirmed that ruling, indicating that " '[a] waiver may be shown by proof of express language of agreement or inferably established by such declarations, acts, and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance.' " *Id*. at 287, citing *Strom-Johnson Constr Co v Riverview Furniture Store*, 227 Mich 55, 67-68; 198 NW 714 (1924). In *Bissell*, 9 Mich App at 287, there was no "specific statement by a representative of defendant to the plaintiff that defendant waived any claimed breach of the contract. However, we do have declarations, acts and conduct of defendant which are inconsistent with the purpose to exact strict performance which constitutes a waiver." Because a representative of the defendant knew that the state planned to place a water main in the right-of-way, the defendant acted inconsistently with the purpose to exact strict performance by the plaintiff because the plaintiff would not be able to fill the area as required under the subcontract. See *id*.

Here, the trial court did not err by concluding that purchasers failed to waive the breach of § 7.7 of the APA, and that there was no evidence of waiver, in denying sellers judgment notwithstanding the verdict. There was no express declaration by Moore indicating he was waiving this claim, or any evidence of an implied waiver indicating a decisive, unequivocal intent to waive. *Patel*, 324 Mich App at 634. Although Moore knew that the consents to assignments were not obtained at the time of closing, this does not constitute an act or conduct inconsistent with exacting strict performance of the APA requiring sellers to provide the consents. See *Bissell*, 9 Mich App at 287.

Rather, Moore's conduct indicated that he sought the consents to assignments when they were not provided at closing, and then not provided for some time. He received final drafts of the proposed assignments in January or February 2019, under the understanding that they would be sent to each owner for signature, and countersigned by Dickson, but this never occurred. Moore

---

[6] Decisions issued by this Court before November 1, 1990, are not precedentially binding, MCR 7.215(J)(1). Nonetheless, published decisions by this Court decided before November 1, 1990, may be considered persuasive authority, *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

testified he met Will in June 2019, to attempt to get the consents, though Will denied that Moore asked Will to procure them at that time. Moore reached out to Dickson personally later that summer, and Dickson proposed possible alternatives to obtaining the consents. When Moore started to experience problems from the lack of consents, he sent sellers notice requesting the assignments and then notice that they were in breach for failure to provide them. Dickson responded by providing two of the assignments. Dickson also proposed amending the APA to indicate that sellers "agree[d] to cooperate" in obtaining the consents, but Moore did not accept the change because it would relieve sellers of their obligation to actually obtain the consents. The evidence of what occurred postclosing in an attempt to obtain the consents establishes that Moore did not waive his claim for breach by closing without the consents.

Moreover, the introductory paragraph of § 7 of the APA provides that sellers "represent, covenant, and warrant the following to be true, which representations, covenants, and warranties *shall survive the Closing*." (Emphasis added.) "When contractual language is unambiguous, courts must interpret and enforce the language as written because an unambiguous contract reflects, as a matter of law, the parties' intent." *Harper Woods Retirees Ass'n v Harper Woods*, 312 Mich App 500, 508; 879 NW2d 897 (2015). Thus, sellers' warranty in § 7.7 extended beyond the date of the closing, and the fact that Moore proceeded to close voluntarily without the consents does not establish that he waived breach of § 7.7 in the event the consents were not provided. Thus, the trial court properly denied sellers judgment notwithstanding the verdict of purchasers' breach-of-contract claim. There was record evidence for the jury to conclude that there was no waiver of this claim by purchasers, despite Moore's knowledge that the consents had not been obtained at closing, and the representation guaranteeing the consents would be obtained survived the closing.

Sellers nonetheless argue that M Civ JI 142.41 was improperly given because purchasers' waiver of breach of § 7.7 does not require separate consideration. This jury instruction provides:

> [*Name of party being sued on contract*] claims that [his/her/its] failure to execute the promise was excused because [*name of party*] waived [his/her/its] performance. To excuse nonperformance, [*name of party being sued on contract*] must prove that [*name of party*] voluntarily and knowingly gave up [his/her/its] right to insist on performance of [*insert performance obligation*]. In other words, [*name of party*] must have known that [he/she/it] had the right to insist on the completion of [*insert performance obligation*] by [*name of party being sued on contract*], but nevertheless agreed to give up this right. A waiver may be expressly stated or it may be implied by acts or conduct, indicating an intent not to enforce the contractual right such that a reasonable person would think that performance was no longer required. A waiver of a substantial right requires consideration. [M Civ JI 142.41.]

On the fifth day of trial, after purchasers rested, sellers moved for directed verdict of purchasers' breach-of-contract claim, and sellers' counsel actually stated, "[w]e both agree you have to have separate consideration for the defendant to waiver," and that separate consideration had been met. Then, after reviewing caselaw, sellers' counsel argued that additional consideration was not required under Michigan law. Regardless, the trial court denied a directed verdict because genuine issues of material fact existed whether there was a waiver. On the last day of trial, defense

counsel again requested that the last sentence of M Civ JI 142.41 be removed because consideration was only required in certain situations of waiver, and here, there was no such requirement. The court denied the request, and gave the model instruction including the last sentence. When sellers again made an argument about the jury instruction in their motion for judgment notwithstanding the verdict, the court held that it did not err by reading the standard instruction.

Jury instructions must include all the elements of the claims and should not omit any material issues, defenses, or theories of the parties that the evidence supports. *Lewis*, 258 Mich App at 211. If an instruction is not supported by the evidence, it should not be given. *Id*. If the instructions adequately and fairly present to the jury all theories of the parties and the applicable law, no error requiring reversal occurs. *Id*. "Reversal based on instructional error is only required where the failure to reverse would be inconsistent with substantial justice." *Id*. at 211-212; see also MCR 2.613(A). When a jury is asked to render a general verdict without being asked to identify specific findings, we cannot conclude that a party has been denied substantial justice. *Zdrojewski v Murphy*, 254 Mich App 50, 64-65; 657 NW2d 721 (2003). A special verdict form that requires the jury address particular issues assists the deliberative process and the task of judicial review. See *Peisner v Detroit Free Press*, 421 Mich 125, 135-136; 364 NW2d 600 (1984); see MCR 2.515(A).

A course of affirmative conduct combined with oral representations may result in the waiver of written contract terms. *Dunn v Bennett*, 303 Mich App 767, 777; 846 NW2d 75 (2014). But when the evidence conflicts regarding changes to a parties' agreement, such as a waiver, the issue presents a question for the trier of fact. See *Case v Bowman*, 265 Mich 106, 107; 251 NW 333 (1933).

Sellers did not demonstrate that the failure to reverse, premised on the court's waiver instruction, is inconsistent with substantial justice. *Lewis*, 258 Mich App at 211-212. M Civ JI 142.41 states that a party may waive performance if it knowingly and voluntarily gave up the right to insist it occur. This waiver may be expressly stated or implied by conduct. *Id*. Lastly, the standard instruction that the waiver of a substantial right requires consideration. *Id*. The party raising the issue of waiver has the burden of proof. *Home-Owners Ins Co v Perkins*, 328 Mich App 570, 586; 939 NW2d 705 (2019).

Sellers failed to demonstrate a deprivation of substantial justice arising from the trial court's provision of the standard instruction. There is no indication that a special verdict form was requested that asked the jury to find whether the sellers met their burden of proof, whether the waiver was express or implied, and finally, whether the waiver was of a substantial right and supported by consideration. In light of this failure to submit a special verdict form, it is speculative whether sellers were deprived of substantial justice.[7]

---

[7] In light of our disposition, we need not address the application of *Babcock v Public Bank*, 366 Mich 124, 135; 114 NW2d 159 (1962), and *Fitzgerald v Hubert Herman, Inc*, 23 Mich App 716, 717; 179 NW2d 252 (1970).

Thus, sellers fail to establish instructional error requiring reversal based on the court giving M Civ JI 142.41 at trial where there was no abuse of discretion in the court's conclusion that the standard instruction should be submitted to the jury. *Case*, 265 Mich at 107. As such, there was no error by the trial court in denying sellers judgment notwithstanding the verdict on the basis of waiver.

## b. DAMAGES

Sellers argue that they were entitled to judgment notwithstanding the verdict of purchasers' breach-of-contract claim because purchasers failed to show damages. To succeed on a claim for breach of contract, the party must prove (1) the existence of a contract, (2) that the other party breached its terms, and (3) that the breach caused damages. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017). The party asserting breach of contract has the burden to prove its damages with reasonable certainty, and may only recover damages that are the direct, natural, and proximate result of the breach. *Id*. at 550. Damages cannot be conjectural or speculative in nature, or "dependent upon the changes of business or other contingencies." *Id*. at 551 (quotation marks and citation omitted). Damages for breach of contract "need not be precisely established;" however, "uncertainty as to the fact of the amount of damage caused by the breach of contract is fatal." *Id*. (quotation marks and citation omitted).

In denying sellers judgment notwithstanding the verdict, the trial court concluded that the evidence was sufficient for the jury to conclude that purchasers suffered damages from breach of § 7.7 of the APA. The court referenced the trial testimony from fact and expert witnesses presented to the jury to support the damages award. Contrary to sellers' arguments on appeal, at trial, purchasers acknowledged the trial court's previous ruling that the management contracts had been assigned as a matter of law. Purchasers argued that the assignments occurred without the owner consents, which constituted a breach, and purchasers suffered damages. Viewing the evidence in the light most favorable to purchasers, the testimony of Moore and purchasers' expert, Michael Kahaian, was sufficient for a jury to conclude that purchasers suffered damages from sellers' breach.

When asked about the breach of the APA, Moore testified that, as a result of not receiving the consents to assignments, he lost

> the right to have a long-term security with those locations, with those owners. I lost the ability to go get financing. I lost the ability to bring in partners. I lost a couple other things as well. Put all the money into those restaurants to keep operations going, improve them. Gave [Dickson] a loan for his payroll. It all starts to add up to real money.

As to amounts, Moore claimed his costs included the $550,000 down payment, the payroll loan of $180,000, the $400,000 he put into the business, and all of his monthly payments of $9,911 from January 2019, to the month of trial, October 2022—approximately $460,000. Moore also testified that he was unable to negotiate with the owners of any of the restaurants to modify or improve the economic terms of the management contracts without having the assignments. The owners would not talk to Moore because they did not recognize him "as the guy who belonged there."

-12-

Kahaian testified that, as an economic damages expert, he had to rely upon liability to determine economic damages in order to "link the harm that's being alleged to any legal determination." Accordingly, Kahaian's damage calculation was premised on the outcome of a legal determination. Kahaian explained "causation" as "the link between the actions or inactions of a party that connect to what financial harm was done in a case." He linked the terms of the APA to the claim that the assignments were not received in order to quantify purchasers' economic harm. He explained:

> My theory has always been to quantify the amount that would place [purchasers] back in the position they would have been, but for the breach. And so according to Mr. Moore, he was relying upon the representations and warranties that the parties agreed upon when closing on the transaction, and therefore, in one of those representations and warranties was that the owner consents within that the management agreements would be provided. And so, therefore, Mr. Moore would not have necessarily—he wouldn't have closed on the transaction without those representations and warranties. Therefore, you could say that the value that he put on the consents was $1.3 million because that was the value of the deal.

Thus, there was sufficient evidence for the jury to conclude that purchasers suffered damages, and that the damages were caused by sellers' breach of the APA. As such, the trial court properly denied sellers' motion for judgment notwithstanding the verdict of purchasers' breach-of-contract claim in this regard.

## 2. UNJUST ENRICHMENT

The trial court also properly denied sellers judgment notwithstanding the verdict of purchasers' unjust-enrichment claim against Dickson.

To establish unjust enrichment, the plaintiff must prove "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Landstar Express America, Inc v Nexteer Auto Corp*, 319 Mich App 192, 205; 900 NW2d 650 (2017) (quotation marks and citation omitted). The doctrine is grounded in theory that the law will imply a contract to prevent the unjust enrichment of the other party. *Id*. at 204. However, a contract cannot be implied where an express contract already exists covering the same subject matter. *Id*. Moreover, the law will only imply a contract to prevent unjust enrichment where the defendant was unjustly or inequitably enriched at the plaintiff's expense. *Id*. at 205. Not all enrichment is necessarily unfair; the key to determining unjust enrichment is whether the party inequitably received and retained an independent benefit. *Id*. The mere fact that a third party benefits from a contract between two others does not make the third party liable for unjust enrichment. *Id*. In the absence of a misleading act by the third person, the failure to perform by one of the contracting parties does not establish a right to restitution against the third person. *Id*.

Before trial, the circuit court judge initially assigned to this case ruled that Dickson was not a party to the APA because he did not sign the APA in his individual capacity. Because he is not a party to the APA, the existence of that contract did not preclude purchasers' unjust-enrichment claim against him. *Id*. at 204. Purchasers' unjust-enrichment claim was premised on

a postclosing agreement in which purchasers agreed to pay payroll of the restaurant and catering businesses' employees in December 2018. The trial court clarified at trial that purchasers' unjust-enrichment claim was limited to $86,500, in light of purchasers pleading that amount in their first amended complaint. Sellers now argue that they were entitled to judgment notwithstanding the verdict of purchasers' unjust-enrichment claim because there was no evidence that Dickson benefited personally from the amount purchasers forwarded for the 2018 payroll. Viewing the evidence in the light most favorable to purchasers, the trial court properly denied sellers judgment notwithstanding the verdict of this claim.

Moore testified that shortly after closing, Dickson asked Moore for additional funds for payroll from mid-December 2018, through New Year's Eve, which were covered in the new year, and Dickson would pay him back. Moore testified it was approximately $180,000. Moore agreed, and paid the employees through Conlan Abu. Dickson testified that in an effort to support Moore and make sure that his endeavors were successful, he gave Moore all of his inventory, his checking account, and told Moore to keep what receivables were coming in. As for payroll, Dickson did not want the employees to have two W-2s in the new year, he told Moore to pay the payroll through the cash in the checking account and the receivables. Dickson testified the total was about $60,000, not $180,000. He averred that Moore did not protest this plan, but rather, was grateful because it was a benefit for which he had not bargained.

However, the money that purchasers provided to cover the payroll was paid to Dickson personally, which Dickson did not deny. Rather, Dickson testified that any check Moore made out to him personally was a choice made by Moore, and that Dickson would sign them over to Best Team. There is no evidence in the record that the amount purchasers provided for payroll was ever returned to purchasers from Dickson. Although Dickson may not have kept the amount in his personal account, he still benefited from using the money to pay the December 2018 payroll. The APA was not executed until January 1, 2019, so purchasers were not owners of the assets at the time the employees worked in December 2018, the time for which they were receiving the payroll. Thus, viewing the evidence in the light most favorable to purchasers, the evidence was sufficient for the jury to find that Dickson was unjustly enriched from the payroll advance, and the trial court properly denied judgment notwithstanding the verdict.

### 3. DAMAGES AWARD

Lastly, as to the direct appeal, we conclude that the trial court did not abuse its discretion by denying sellers' motion for a new trial or remittitur predicated on the verdict being excessive.[8]

"This Court reviews the trial court's denial of a motion for new trial for an abuse of discretion." *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor, & Merrill, Inc*, 267 Mich App 625, 644; 705 NW2d 549 (2005). This Court also reviews the trial court's decision to deny

---

[8] Sellers also contend that a new trial or remittitur is warranted because of the alleged instructional error in M Civ JI 142.41. In light of our conclusion that the instruction did not warrant judgment notwithstanding the verdict, we similarly conclude that the trial did not abuse its discretion in denying the requested relief in this context.

remittitur for an abuse of discretion. *Taylor v Kent Radiology*, 286 Mich App 490, 522; 780 NW2d 900 (2009). "An abuse of discretion occurs when a trial court's decision is not within the range of reasonable and principled outcomes." *Law Offices of Jeffrey Sherbow, PC*, 347 Mich App at 557 (quotation marks and citation omitted).

The sellers assert that the verdict was excessive and should be remitted to $0 because purchasers were awarded COVID-relief funds. When the trial court is to decide a motion for remittitur, it must examine the evidence in the light most favorable to the nonmoving party and determine whether the evidence supported the jury award. *Taylor*, 286 Mich App at 522. "If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed." *Id*. (quotation marks and citations omitted). In other words, "[t]he power of remittitur should be exercised with restraint." *Id*.

Sellers argue on appeal that purchasers were awarded reliance damages, rather than benefit-of-the-bargain damages, and as such, the award should be offset or remitted to $0 by the COVID-relief funds. Reliance damages are typically awarded in actions raising promissory estoppel, the elements of which are

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided.
>
> . . . The guiding principle in determining an appropriate measure of damages is to ensure that the promisee is compensated for the loss suffered to the extent of the promisee's reliance. Damages awarded in promissory estoppel actions may include an award of lost profits, and out-of-pocket expenses incurred in preparation for performance or in the performing of the work that was induced by the promisor. [*Joerger v Gordon Food Serv, Inc*, 224 Mich App 167, 173-174; 568 NW2d 365 (1997) (quotation marks and citations omitted).]

On the other hand, damages recoverable for breach of contract

> arise naturally from the breach or . . . were in contemplation of the parties at the time the contract was made. Application of this principle in the commercial contract situation generally results in a limitation of damages to the monetary value of the contract had the breaching party fully performed under it. [*Lawrence v Will Darrah & Assoc, Inc*, 445 Mich 1, 6; 516 NW2d 43 (1994) (quotation marks and citations omitted).]

Although purchasers' expert, Kahaian, used the term "out-of-pocket" dollars to explain the methodology he used to calculate purchasers' damages, he otherwise clearly explained that the theory of damages he used was to put purchasers, the harmed party, in the position they would have been in had the APA not been breached. He clarified that he used this methodology because it would be too speculative to reach a figure for lost profits based on future projections. It is ultimately unknown what type of damages the jury contemplated when it awarded purchasers

damages. Regardless, the award was not excessive, and sellers were not entitled to a new trial or remittitur.

Moore testified that Conlan Abu applied for money from the Restaurant Revitalization Fund. During opening argument, sellers' counsel implied that Moore did not disclose in this application that some of the restaurants had closed in 2019. Moore still had other restaurants in operation in 2020 and 2021, and disclosed in the application which restaurants closed in 2019, i.e., Nomad, No. VI Steakhouse, MDC, and Soul Café. All of the financial information included in the application came from Dickson's companies. Moore received an award of $5.02 million in relief funds, which could only be used in certain ways. Moore tracked how the money was appropriately used. Moore testified that he was not reimbursed for any of his losses associated with sellers and the APA from the relief-funds award. The award was based on revenue, and had Moore received the assignments, he could have been awarded more; but he would have gotten the award whether or not the consents and assignments were received.

Kahaian testified that purchasers' receipt of the COVID-relief funds did not mitigate the damages they suffered from breach of the APA because they were "mutually exclusive of one another;" the received funds were "totally separate" from the harm caused from the breach of the APA. The relief funds were not tied to purchasers' economic damages or related in any way to the losses purchasers incurred. Kahaian testified that had there been no breach of the APA, purchasers still would have been entitled to relief funds if they qualified.

Purchasers sought $2.46 million in damages at trial. The jury only awarded a little over $1 million. Thus, the award was not "clearly or grossly inadequate or excessive" to justify a new trial. MCR 2.611(A)(1)(d). Additionally, viewing the evidence in the light most favorable to purchasers, the COVID-relief funds are separate from the claimed damages by purchasers and irrelevant to the final award. Thus, the trial court did not abuse its discretion by denying sellers remittitur of the jury's verdict based on the award of COVID-relief funds.

## B. CROSS-APPEAL

On cross-appeal, purchasers argue that the trial court erred by dismissing claims against Dickson pretrial, and by refusing to permit amendment. We disagree. The trial court properly dismissed purchasers' claims for breach of contract, fraud and misrepresentation, and estoppel against Dickson in his individual capacity. Additionally, the trial court did not err by denying purchasers' request to amend their unjust-enrichment claim against Dickson.

Sellers moved for summary disposition of all the claims in purchasers' first amended complaint under MCR 2.116(C)(10). This Court reviews a trial court's decision to grant or deny summary disposition de novo. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020).

> A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) when the affidavits or other documentary evidence, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law. [*Id*. (quotation marks and citation omitted).]

-16-

"The moving party must first specifically identify the issues as to which it believes there is no genuine issue as to any material fact, and has the initial burden of supporting its position with affidavits, depositions, admissions, or other admissible documentary evidence." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475; 776 NW2d 398 (2009) (quotation marks, citations, and brackets omitted). When this burden is met, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Id*. The nonmoving party may not rely on mere allegations or denials in the pleadings, but must set forth specific facts showing that a genuine issue of material fact exists. *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

Decisions to grant or deny motions to amend pleadings are reviewed for an abuse of discretion. *Weymers v Khera*, 454 Mich 639, 654; 563 NW2d 647 (1997). "An abuse of discretion occurs when a trial court's decision is not within the range of reasonable and principled outcomes." *Law Offices of Jeffrey Sherbow, PC*, 347 Mich App at 557 (quotation marks and citation omitted). This Court also reviews the interpretation of a court rule de novo. *Bint v Doe*, 274 Mich App 232, 234; 732 NW2d 156 (2007).

As an initial matter, the trial court properly dismissed purchasers' claim for breach of contract against Dickson in his individual capacity because he was not a party to the APA. It is well established that a corporation or other corporate entity "is a legal fiction," i.e., "an artificial being, invisible, intangible, and existing only in contemplation of law." *Green v Ziegelman*, 310 Mich App 436, 450-451; 873 NW2d 794 (2015) (quotation marks and citations omitted). Absent an abuse of corporate form, courts presume that the entity is separate and distinct from its owner or owners, even when a single person owns and operates the entity. *Id*. at 451. The court may "pierce the corporate veil" only when the corporation or other entity is being used to defeat public convenience, justify wrong, protect fraud, or defend crime, in which case, the court may "look through the veil of corporate structure . . . to avoid fraud or injustice." *Id*. (quotation marks and citation omitted).

The APA identified Dickson as the sole shareholder or owner of the corporations and LLC owning the restaurants and catering businesses included in the restaurant group. Dickson signed the APA as president of each corporation and the authorized member of Soul Café, LLC. Although he was identified and referred to as "Owner" in the APA, he did not sign it on his own behalf, or otherwise make any guarantees that he would be personally liable for sellers' obligations under the contract. Although the introductory paragraph of § 7 provides that "Seller and Owner . . . represent, covenant, and warrant the following to be true . . . ," § 7.7 excludes Dickson as owner, and states that "Seller has, to the best of Seller's knowledge, complied with" all the provisions of the contract. Thus, the court properly dismissed purchasers' breach-of-contract claim against Dickson in his individual capacity as he was not a party to the APA, despite the "Owner" language and his signing of the document.

As to purchasers' claims for fraud, misrepresentation, and estoppel against Dickson individually, the trial court properly dismissed them under the merger clause of the APA. Section 16.4 of the APA provided:

**16.4 Entire Agreement.** This Agreement sets forth the entire understanding of the Parties; further, this Agreement shall supersede and/or replace any oral or written agreement(s) relating to this subject matter entered into by the Parties before the date of this Agreement.

When contract language is clear and unambiguous, parol evidence of contract negotiations or previous or contemporaneous agreements that contradict the written contract is not admissible to vary the contract's terms. *Barclae v Zarb*, 300 Mich App 455, 480; 834 NW2d 100 (2013). Parol evidence may be admissible to demonstrate fraud, but where a contract contains an express merger clause, only certain types of fraud can invalidate the contract. *Id*.

> [W]hile parol evidence is generally admissible to prove fraud, fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract. Thus, when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause. [*UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 503; 579 NW2d 411 (1998).]

Purchasers' fraud and misrepresentation claims purportedly arise from Dickson's statement on December 31, 2018, that he would obtain the consents to assignments, before the parties closed on January 1, 2019. These claims fail because Dickson made the statements on behalf of sellers, and under the merger clause, any previous oral statement was superseded by the APA. See *id*. Dickson's statements did not relate to the merger clause, and as such, did not invalidate the entire contract. See *id*. Rather, the APA assigned the management contracts to purchasers at closing, and the language provided that sellers would obtain the consents. Thus, summary disposition of purchasers' fraud and estoppel claims against Dickson individually was proper.

Lastly, purchasers argue that the trial court should have permitted amendment of their unjust-enrichment claim to "expand its scope." The trial court rejected this argument three times. First, purchasers moved to file a second amended complaint to expand their unjust-enrichment claim against Dickson regarding the payroll advance. The trial court denied the motion based on undue delay, repeated failure to cure deficiencies, and undue prejudice. Purchasers moved for reconsideration of this order, asserting that they could not have amended their unjust-enrichment claim against Dickson before the trial court ruled that Dickson was not a party to the APA in its December 22, 2021 opinion and order. The trial court denied this motion. Then, on the eve of one of the first-scheduled trial dates, purchasers moved to "amend and correct legal errors," once again seeking to amend their unjust-enrichment claim against Dickson. The court denied this motion as procedurally improper and on the merits.

MCR 2.116(I)(5) provides that if summary disposition is asserted under MCR 2.116(C)(8), (9), or (10), the court shall allow the parties to amend their pleadings under MCR 2.118, "unless the evidence then before the court shows that amendment would not be justified." In interpreting a court rule, this Court "accord[s] every word or phrase of a [] court rule its plain and ordinary meaning." *Brausch v Brausch*, 283 Mich App 339, 348; 770 NW2d 77 (2009).

Leave to amend " 'shall be freely given when justice so requires,' " unless amendment would be futile. *Weymers*, 454 Mich at 658, citing MCR 2.116(I)(5) and MCR 2.118(A)(2). A motion to amend should typically be granted, and only denied based on undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility. *VHS of Mich, Inc v State Farm Mut Auto Ins Co*, 337 Mich App 360, 373; 976 NW2d 109 (2021). Delay, alone, does not warrant denial of amendment. *Weymers*, 454 Mich at 659. In this context, prejudice exists if amendment prevents the opposing party from receiving a fair trial. *Id*.

Here, the trial court did not err when it denied purchasers' many requests to amend its claim. Purchasers' motion to correct legal errors and seek amendment was clearly an attempt to obtain a different ruling after the case was reassigned from one judge to another. Thus, it appears that amendment was for a dilatory motive, *VHS of Mich, Inc*, 337 Mich App at 373, as the court had already denied amendment in two prior orders. Moreover, a trial court has the inherent authority to control its own docket and internal affairs to achieve an orderly and expeditious disposition of cases. *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016). Under these circumstances, the trial court did not abuse its discretion by denying purchasers the opportunity to amend their unjust-enrichment claim.[9]

IV. DOCKET NO. 368946

Lastly, in the 2023 case, the trial court properly granted purchasers summary disposition of Best Team's claim for breach of the promissory note under MCR 2.116(C)(6).[10]

This Court reviews de novo the trial court's decision on a motion for summary disposition. *George v Allstate Ins Co*, 329 Mich App 448, 454; 942 NW2d 628 (2019). "Summary disposition cannot be granted under MCR 2.116(C)(6) unless there is another action between the same parties involving the same claims currently initiated and pending at the time of the decision regarding the motion for summary disposition." *Planet Bingo, LLC v VKGS, LLC*, 319 Mich App 308, 323; 900 NW2d 680 (2017) (quotation marks, citation, and brackets omitted). This court rule "is a codification of the former plea of abatement by prior action, the purpose of which was to protect parties from the harassment of new suits." *Id*. at 325 (quotation marks and citation omitted). It seeks to prevent "litigious harassment involving the same question and claims as those presented in pending litigation." *Id*. When reviewing a motion brought under MCR 2.116(C)(6), the trial

---

[9] Purchasers also argue on cross-appeal that the trial court erred by ruling that the management contracts were assigned as a matter of law under § 1.1 of the APA. Purchasers, however, acknowledge that this argument need not be addressed if we affirmed the final judgment in purchasers' favor and rejected sellers' arguments on direct appeal. In light of our affirmance of the final judgment and purchasers' representation, we do not address this argument.

[10] We question whether Best Team preserved the theory that, at trial, it was assumed that the balance of the promissory note would be paid. This aspect was first raised in the motion for reconsideration. We may overlook preservation requirements and do so with regard to this argument. See *George v Allstate Ins Co*, 329 Mich App 448, 454; 942 NW2d 628 (2019).

court must consider the affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties. MCR 2.116(G)(5).

As an initial matter, the requirement that the two actions involve the "same parties" does not require that all parties be identical. *Fast Air, Inc v Knight*, 235 Mich App 541, 545 n 1; 599 NW2d 489 (1999). Here, however, purchasers and Best Team were parties in both the 2019 and the 2023 actions, satisfying this requirement.

Additionally, both actions must involve the same claims, though the claims need not be identical. *JD Candler Roofing Co, Inc v Dickson*, 149 Mich App 593, 598; 386 NW2d 605 (1986). Rather, "the two suits must be based on the same or substantially the same cause of action." *Id.* (quotation marks and citation omitted). A motion under MCR 2.116(C)(6) is properly granted where resolution of the action will require examination of the same operative facts as the pending action. *Id.* at 601.

First, Best Team argues that the 2023 case does not arise from the same operative facts as the 2019 case. This argument is unpersuasive. Best Team claimed purchasers breached the promissory note that was executed in conjunction with the APA, both of which were at issue in the 2019 case. Best Team's claim in the 2023 case arises from the same failed transaction between sellers and purchasers for the purchase of the assets of the restaurant group. In sellers' counterclaim filed in the 2019 case, sellers asserted, on Best Team's behalf, a claim for breach of the promissory note, arguing that purchasers and the orchard entities breached or repudiated the promissory note by tendering back the assets and asserting that Best Team breached the APA. Thus, although Best Team's claim for breach of the promissory note in the 2023 case involves a default claim under the note from purchasers' failure to make a payment in December 2022, the 2023 case still arises from the same underlying operative facts as the 2019 case.

Next, Best Team argues that the trial court erred by concluding that the 2019 case resolved the issue of whether any more payments were due on the promissory note because the note was a separate and distinct contract from the APA. The trial court did not err by concluding that breach of the promissory note was litigated in the 2019 case. Sellers asserted this claim on Best Team's behalf in the counterclaim, and the jury found that sellers failed to prove breach of the promissory note at trial. Although Best Team's breach claim was based on purchasers' tendering back the assets rather than defaulting on payment, this distinction does not preclude dismissal of Best Team's claim. The jury determined that sellers had breached the APA. "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (quotation marks and citation omitted). This rule only applies when the initial breach is substantial; to determine whether a breach is material, the court considers whether the nonbreaching party obtained the benefit it reasonably expected to receive. *Omnicom of Mich v Giannetti Investment Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997). Because the jury determined that sellers breached the APA, their rights under the APA were extinguished.

Best Team's argument that it still had rights to payment under the promissory note because it was a separate contract from the APA is unpersuasive. Section 7 of the promissory note provided that Best Team, as holder of the note, "shall have all of the rights and powers set forth in the [APA] as thought [sic] there [sic] were set forth fully in this note." "When a contract incorporates a

writing by reference, it becomes part of the contract, and courts must construe the two documents as a whole." *In re Estate of Koch*, 322 Mich App 383, 399; 912 NW2d 205 (2017). Thus, because sellers no longer had any rights under the APA, and the promissory note incorporated the APA by reference, Best Team, as a holder of the note and an affiliate of sellers, had no right to further payment under the note.

Best Team's argument that the trial court's decision on a jury instruction in the 2019 case leads to a different conclusion is unpersuasive. The parties at trial disputed the jury instruction on first material substantial breach as an affirmative defense, which, as proposed, provided:

> If you find that [sellers] committed a substantial breach of the APA by failing to deliver the Assignments through an appropriate instrument of transfer with owner consents before [purchasers] committed a breach of the APA, then your verdict should be in favor of [purchasers], and against all [sellers] on [sellers'] breach of contract counterclaims, including their claims arising under the promissory note, for any additional purchase price under Section 3 of the APA, and under the security agreement.

Sellers objected to the instruction, arguing there was no basis that a first material breach by sellers of the APA affected Best Team's claims under the note. The court sustained the objection, and struck from the instruction the last phrase, beginning with "including their claims arising under the promissory note . . . ." Contrary to Best Team's argument, this ruling on a jury instruction does not equate to a ruling that purchasers had to keep making payments on the promissory note, nor was it dispositive to this issue on summary disposition in the 2023 case.

Lastly, Best Team argues that because purchasers' requested damages at trial to put them in the position they would have been in had the contract been performed, and counsel indicated this included the "remaining payments on the note," purchasers could not now argue that they no longer had to make payments on the promissory note after trial. However, a party is allowed to plead alternate theories of recovery at trial, and to have those theories submitted to the jury, even when those theories are potentially inconsistent. See MCR 2.111(A); *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 328; 657 NW2d 759 (2002). During closing argument, purchasers' counsel explained Kahaian's testimony and how purchasers reached the number they were requesting in damages. He said that Kahaian took the down payment, the payments made on the promissory note, the amount Moore contributed to cover operating expenses plus interest, and "the remaining payments on the note," to come to a total of $2.4 million. Attorneys are given some leeway during closing arguments, see *Heintz v Akbar*, 161 Mich App 533, 539; 411 NW2d 736 (1987), and the jury was instructed that "[e]vidence includes only the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you—I told you to consider as evidence." The closing argument of purchasers' counsel explaining that the remaining payments on the promissory note were included in purchasers' calculation of their damages did not preclude purchasers from arguing in the 2023 case that they were no longer required to make payments on the note, or preclude summary disposition on Best Team's breach claim.

## V. CONCLUSION

In Docket No. 370769, the final judgment entered in purchasers' favor in the 2019 case is affirmed because the trial court properly denied sellers' motion for judgment notwithstanding the verdict and motion for a new trial or remittitur. Additionally, purchasers are not entitled to any relief in their cross-appeal. In Docket No. 368946, the trial court's order in the 2023 case granting purchasers summary disposition of Best Team's claim for breach of the promissory note is affirmed.

Affirmed.

/s/ Anica Letica
/s/ Michelle M. Rick
/s/ Mariam S. Bazzi